OPINION OF THE COURT
 

 Titone, J.
 

 This defamation action concerns an article that was published on the Op Ed page of the New York Times on October 21, 1991. Although plaintiff alleged that the statement falsely accused him of participating in an illegal conspiracy, his complaint was dismissed on the theory that the publication was a nonactionable statement of the author’s opinion. The correctness of this determination depends on the proper application of the principles established in
 
 Immuno AG. v Moor-Jankowski
 
 (77 NY2d 235,
 
 cert denied
 
 500 US 954), in which this Court held that both the immediate context and the broader social context in which a published statement was made should be considered in determining whether the statement is one conveying opinion or fact.
 

 The disputed article, entitled "A High-Tech Watergate,” was written by defendant Elliot Richardson, a former United States Attorney General. In the article, defendant described his role as attorney for a software company, Inslaw, Inc., which had sold a computer-based case-tracking system to the United States Department of Justice. According to the article, the Department of Justice soon created a series of "sham” controversies regarding the software’s cost and performance and eventually withheld payment, leading to Inslaw’s bankruptcy. Meanwhile, defendant charged, the Department made illegal copies of the software.
 

 The focus of the remainder of the article was a series of charges that had come to defendant’s attention regarding the use of this pirated software to further a subversive criminal conspiracy. According to the article, defendant had been told by former Justice Department employees that plaintiff Dr. Earl W. Brian, who had been "California health secretary under Gov. Ronald Reagan and a friend of Attorney General Edwin Meese 3d,” was "linked to a scheme to take Inslaw’s stolen software and use it to gain the inside track on a $250
 
 *49
 
 million contract to automate Justice Department litigation divisions.” Plaintiff was identified as the controlling shareholder of a corporation in which Attorney General Meese’s wife also had an interest. Further, the article noted, this corporation controlled another computer company that had earlier launched an "aggressive” effort to acquire Inslaw.
 

 The article also referred to claims made by a Michael Riconosciuto, "an out-of-fiction character believed by many knowledgeable sources to have C.I.A. connections,” to the effect that Inslaw’s software had been "stole[n]” "as part of a payoff to [plaintiff] for helping to get some Iranian leaders to collude in the so-called October surprise, the alleged plot by the Reagan campaign in 1980 to conspire with Iranian agents to hold up release of the American Embassy hostages until after election.” According to the article, "other informants from the world of covert operations” not only "confirm[ed] and supplement[ed]” Riconosciuto’s statements but also alleged that "scores of foreign governments now have [Inslaw’s] software” and that plaintiff had been given the opportunity to sell this software as a reward. These sources identified the conspiracy’s goals as follows: "to generate revenue for covert operations not authorized by Congress” and "to supply foreign intelligence agencies with a software system that would make it easier for U.S. eavesdroppers to read intercepted signals.”
 

 Defendant acknowledged that his informants "are not what a lawyer might consider ideal witnesses.” However, defendant went on to argue that in his view their story was credible. According to defendant’s theory, "the picture that emerges from the individual statements is remarkably detailed and consistent, all the more so because these people are not close associates of one another.” Further, "[i]t seems unlikely that so complex a story could have been made up, memorized all at once and closely coordinated.” Defendant noted that a skeptical free-lance journalist, one Danny Casolaro, had obtained "many leads” from the same informants and had been found dead in a hotel room after telling friends he was investigating evidence "linking Inslaw, the Iran-contra affair and the October surprise.” Defendant opined that Casolaro had been murdered, although the authorities had concluded that his death was a suicide.
 

 The remainder of the article discussed defendant’s efforts to persuade Edwin Meese’s successor, Attorney General Thorn-burgh, to investigate, as well as the Justice Department’s purported resistance to a congressional investigation. The
 
 *50
 
 article ended with a review of defendant’s own decision as former President Richard Nixon’s Attorney General to utilize an independent prosecutor to investigate the Watergate affair. In the article’s final paragraph, defendant argued that the question of the need for a special prosecutor to investigate the In-slaw affair was one that should be considered not only by the Justice Department, but also by Congress, other entities within the executive branch and, lastly, the public itself.
 

 Following the article’s publication, plaintiff commenced the present action for damages, alleging that it contained false and defamatory assertions about him and that defendant had published these assertions with reckless disregard for their accuracy. Specifically, plaintiff’s complaint alleged that he had been defamed by the article’s assertions that (1) he was part of a scheme to steal Inslaw’s software to gain an unfair business advantage, (2) he was the beneficiary of politically motivated favoritism, (3) he had participated in a morally reprehensible scheme to delay the safe return of American hostages, (4) he had sold stolen software to foreign governments to advance illegal covert activities and (5) he had somehow been involved in the murder of an investigative journalist.
 

 On February 26, 1993, the trial court dismissed the complaint, reasoning that "A High-Tech Watergate” would be understood by a reasonable reader "as a policy argument on a matter of public concern” and that its allegations were therefore not actionable under this Court’s opinion in
 
 Immuno AG. v Moor-Jankowski
 
 (77 NY2d 235,
 
 supra).
 
 The dismissal was affirmed by the Appellate Division, which cited
 
 Gross v New York Times Co.
 
 (82 NY2d 146) as well as
 
 Immuno
 
 and concluded that the article made clear to "the average reader or listener” that its accusations were " 'merely a personal surmise’ ” built upon allegations and claims made by others (211 AD2d, at 414, quoting
 
 Gross v New York Times Co., supra,
 
 at 155). Both courts below stressed that the article in question was published on the Op Ed page of the newspaper, a space that is traditionally reserved for the expression of opinion and encouragement of public debate. Plaintiff then took a further appeal by permission of this Court.
 

 The law governing defamation actions involving communications purporting to convey opinion has been explored in a quartet of recent Court of Appeals decisions
 
 (Gross v New York Times Co., supra; 600 W. 115th St. Corp. v Von Gutfeld,
 
 80 NY2d 130,
 
 cert denied
 
 508 US 910;
 
 Immuno AG. v Moor-Jankowski, supra; Steinhilber v Alphonse,
 
 68 NY2d 283). The
 
 *51
 
 essence of the tort of libel is the publication of a statement about an individual that is both false and defamatory. Since falsity is a
 
 sine qua non
 
 of a libel claim and since only assertions of fact are capable of being proven false, we have consistently held that a libel action cannot be maintained unless it is premised on published assertions of
 
 fact (Gross v New York Times Co., supra,
 
 at 152-153;
 
 Immuno AG. v Moor-Jankowski, supra; see also, Milkovich v Lorain Journal Co.,
 
 497 US 1, 17-21).
 

 Distinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task. The factors to be considered are: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to ' "signal * * * readers or listeners that what is being read or heard is likely to be opinion, not fact” ’ ”
 
 (Gross v New York Times Co., supra,
 
 at 153, quoting
 
 Steinhilber v Alphonse, supra,
 
 at 292;
 
 accord, Immuno AG. v Moor-Jankowski, supra).
 
 It is the last of these factors that lends both depth and difficulty to the analysis.
 

 The significance of the context factor was explicated in
 
 Immuno AG. v Moor-Jankowski (supra).
 
 In that case, we rejected an analysis that would first search a publication for specific factual assertions and then hold those assertions actionable unless they were couched in figurative or hyperbolic language
 
 (id.,
 
 at 254). Instead, we held that, in distinguishing between actionable factual assertions and nonactionable opinion, the courts must consider the content of the communication as a whole, as well as its tone and apparent purpose. Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis "whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff”
 
 (id.,
 
 at 254, citing
 
 Steinhilber v Alphonse, supra,
 
 at 293).
 

 In addition to considering the immediate context in which the disputed words appear, the courts are required to take into consideration the larger context in which the statements were published, including the nature of the particular forum. In
 
 Im
 
 
 *52
 

 muno,
 
 for instance, the challenged communication was a letter to the editor of a professional journal — a medium that is typically regarded by the public as a vehicle for the expression of individual opinion rather than " 'the rigorous and comprehensive presentation of factual matter’ ” (77 NY2d, at 253, quoting 145 AD2d 114, 129). Similarly, in
 
 600 W. 115th St. Corp. v Von Gutfeld (supra,
 
 at 143-144), the alleged defamatory remarks were made at a public hearing, where the listeners presumably expect to hear vigorous expressions of personal opinion. In the same vein, the disputed statements in
 
 Steinhilber v Alphonse (supra,
 
 at 294) were made by the defendant union official as part of a recorded telephone message that was calculated to punish a "scab” in the aftermath of an acrimonious labor conflict. In
 
 that
 
 context, where the " 'audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole,’ ” we opined that statements which might otherwise be viewed as assertions of fact may take on an entirely different character
 
 (id.,
 
 quoting
 
 Information Control Corp. v Genesis One Computer Corp.,
 
 611 F2d 781, 784).
 

 By way of contrast, in
 
 Gross v New York Times Co. (supra,
 
 at 155-156), where the defendants’ statements were held to be actionable assertions of fact, we stressed that the accusations had been made "in the course of a lengthy, copiously documented newspaper series that was written * * * after what purported to be a thorough investigation.” Further, we noted that the articles appeared in the news section of the newspaper where, unlike the editorial section, the reader expects to find factual accounts
 
 (id.,
 
 at 156). Finally, the identity, role and reputation of the author may be factors to the extent that they provide the reader with clues as to the article’s import.
 

 We emphasize that an article’s appearance in the sections of a newspaper that are usually dedicated to opinion does not automatically insulate the author from liability for defamation. Despite our firm commitment to encouraging the robust exchange of ideas through these and similar media, we have never suggested that an editorial page or a newspaper column confers a license to make false factual accusations and thereby unjustly destroy individuals’ reputations
 
 (see, e.g., Immuno AG. v Moor-Jankowski, supra,
 
 at 254). To the contrary, we have repeatedly emphasized that the forum in which a statement has been made, as well as the other surrounding circumstances comprising the "broader social setting,” are only useful gouges for determining whether a reasonable reader or listener would understand the complained-of assertions as opinion or statements of fact.
 

 
 *53
 
 In this case, the statements in dispute were made in an article that was published on the Op Ed page of a newspaper. Like the "letters to the editor” section in which the
 
 Immuno
 
 publication appeared, the Op Ed page is a forum traditionally reserved for the airing of ideas on matters of public concern. Indeed, the common expectation is that the columns and articles published on a newspaper’s Op Ed sections will represent the viewpoints of their authors and, as such, contain considerable hyperbole, speculation, diversified forms of expression and opinion. Thus, the "broader context” in which "A High-Tech Watergate” was published provided some signals to the reader that its contents were expressions of opinion.
 

 The immediate context in which the challenged statements were made also supports the conclusion that the specific accusations of which plaintiff complains could not have been understood by a reasonable reader as assertions of fact that were proffered for their accuracy. At the outset of the article, defendant disclosed that he had been Inslaw’s attorney, thereby signalling that he was not a disinterested observer
 
 (cf., Immuno AG. v Moor-Jankowski, supra,
 
 at 254). Further, the predominant tone of the article, which was rife with rumor, speculation and seemingly tenuous inferences, furnished clues to the reasonable reader that "A High-Tech Watergate” was something less than serious, objective reportage.
 

 Finally, the purpose of defendant’s article was to advocate an independent governmental investigation into the purported misuse of the software that Inslaw had sold to the Justice Department. To support this argument, defendant marshalled the relevant rumors and accusations that were floating around the Justice Department and strung them together with the few supporting "facts” that he had been able to glean from the public record and from private sources and personal knowledge. Indeed, without a recitation of the existing unresolved charges, defendant’s call for a full-scale investigation would have made no sense. Given this contextual background, we conclude on this record that a reasonable reader would understand the statements defendant made about plaintiff as mere
 
 allegations
 
 to be investigated rather than as
 
 facts.
 

 Significantly, most of the accusations about plaintiff that defendant recounted were identified in the article as mere "claims” that had been made by identified and unidentified sources. Further, although defendant unquestionably offered his own view that these sources were credible, he also set out the basis for that personal opinion, leaving it to the readers to
 
 *54
 
 evaluate it for themselves. Thus, there was no suggestion in the article that there were additional undisclosed facts on which its credibility assessment had been based
 
 (see, Gross v New York Times Co., supra,
 
 at 153, citing
 
 Hotchner v Castillo-Puche,
 
 551 F2d 910, 913,
 
 cert denied sub nom. Hotchner v Doubleday & Co.,
 
 434 US 834).
 

 To be sure, the fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character. Here, however, the repeated charges were included in the article not necessarily to convince the reader of plaintiff’s dishonesty but rather to demonstrate the need for an investigation that would establish the truth or falsity of the charges.
 

 In sum, both the immediate context of the article itself and the broader context in which the article was published made it sufficiently apparent to the reasonable reader that its contents represented the opinion of the author and that its specific charges about plaintiff were allegations and not demonstrable fact. Under these circumstances, plaintiff failed to state a cognizable libel claim and his complaint was properly dismissed.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed, with costs.