■ ALBERT J. MILLUS, Appellant, v NEWSDAY, INC., et al., Respondents. [638 NYS2d 613] —Order, Supreme Court, New York County (Martin Schoenfeld, J.), entered June 24, 1994, which granted defendants' motion for summary judgment dismissing the complaint, reversed on the law, and the complaint reinstated, with costs.

The question before us is whether the broad freedom ac-

corded to the press extends to a situation where a reporter's impressions of a political candidate's position can unequivocally be reported as the candidate's own admissions.

The statement at issue in this action for libel was printed on the editorial page of defendant newspaper a few days prior to a special election to the New York State Assembly and asserted that plaintiff, who was the Republican candidate in an overwhelmingly Democratic district, "admits he doesn't expect to win and is relieved by the prospect." Plaintiff does not contest evidence offered by defendants indicating that he had acknowledged to defendant Willa Appel, the reporter who interviewed him, that he had little chance of winning the election and that, in his response to a query regarding whether he wanted to win he made reference to the income reduction that winning would entail. Plaintiff denies however, that he ever stated that a loss would be a relief to him or that he did not wish to be elected and defendants acknowledge that the first draft of the editorial stated only that "plaintiff seems neither to want nor expects to win."

The IAS Court held that the entire editorial, including the statement at issue, was protected opinion and dismissed plaintiff's complaint. We find to the contrary and reverse.

The threshold question of whether a statement is a protected opinion or a potentially actionable statement of fact is one of law for the court (*Steinhilber v Alphonse*, 68 NY2d 283, 290). In making this determination the court must define the words as they are commonly understood, determine whether the statement is subject to verification so that it may be characterized as true or false, and review the communication as a whole, considering its tone and purpose (*Immuno AG. v Moor-Jankowski*, 77 NY2d 235, *cert denied* 500 US 954). In this case, we find that, by using the word "admits," which has a commonly understood meaning,[1] defendants clearly conveyed to a reasonable reader that they were giving a factual account of a statement actually made by plaintiff, rather than offering their own opinion of plaintiff's attitude. Nothing about the context in which this statement was published indicated that the fact that the admission was made was anything other than objective fact. That the statement was made within an editorial or that the editorial contained other statements which were clearly opinion do not detract from the fact that this particular sentence conveyed a statement of fact, i.e., the content of an actual admission by plaintiff (*see, Guccione v Flynt*, 618 F Supp

---

1. Which is, according to Webster's Ninth New Collegiate Dictionary (1990), "to concede as true or valid."

164). We cannot accept that the public's perception of journalism has become so cynical that it assumes that apparent statements of fact made in the editorials of a widely published and respected newspaper are fabrications. While defendants emphasize that this particular editorial made clear that it considered the outcome of the election a foregone conclusion in favor of plaintiff's opponent, this fact, on its own, would hardly alert the reader that the writer would misattribute words to plaintiff in the guise of an "opinion".

As the Court of Appeals pointed out in *Brian v Richardson* (87 NY2d 46, 52), "[W]e have never suggested that an editorial page or a newspaper column confers a license to make false factual accusations and thereby unjustly destroy individuals' reputations (*see, e.g., Immuno AG. v Moor-Jankowski, supra,* at 254). To the contrary, we have repeatedly emphasized that the forum in which a statement has been made, as well as the other surrounding circumstances comprising the 'broader social setting,' are only useful gauges for determining whether a reasonable reader or listener would understand the complained-of assertions as opinion or statements of fact."

Here, unlike the Op Ed piece involved in *Brian*, the reader of the editorial had no reason to assume that the writer had an ulterior motive to slant the facts upon which the expressed opinion was based to serve his or her own agenda, and nothing about the tone or the purpose of the editorial informed the reader that, in disclosing plaintiff's admission, the writer was "marshall[ing] the relevant rumors" (*supra,* at 53) about plaintiff rather than repeating the remarks actually made by plaintiff in an interview. An Op Ed piece, in distinction, is by its very nature understood to be an expression of the writer's personal views and opinions. We find, therefore, that the statement is one of fact.

Defendants further argue that even if the statement attributing the admission was a false statement of fact, it is not actionable because it was not defamatory and caused plaintiff no injury. It is well established that a statement may be found to be defamatory, even in the absence of special damages, where " 'it tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society' " (*Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, *cert denied* 434 US 969, quoting *Sydney v Macfadden Newspaper Publ. Corp.,* 242 NY 208, 211-212). In analyzing plaintiff's claim that he was injured, it is important to keep in mind that the falsity in a fabricated

quotation consists not necessarily in its contents, but in the assertion that such words were ever spoken at all. Thus, as noted by the Supreme Court, the danger in a fabricated quotation is not only that it might attribute an untrue factual assertion to the speaker, which itself may or may not be defamatory, but that "regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold" (*Masson v New Yorker Mag.*, 501 US 496, 511).

Here, the nexus of plaintiff's claim is that he never made the admission attributed to him and that he was defamed, not only by its substantive falsehood, but simply by the fact that people would believe he would say such a thing, i.e., that he was made to look ridiculous and dishonest not only by the very idea that he would be relieved not to win the election in which he was asking people to vote for him but by the additional assertion that he had freely admitted it, thereby making a mockery of permitting his name to remain on the ballot. Under these circumstances, we find that the attribution to plaintiff of these words is sufficiently capable of a defamatory construction to present a jury question as to whether this statement was such as to hold plaintiff up to public "contempt, ridicule or disesteem" (*Cyran v Finlay Straus, Inc.*, 302 NY 486, 489).

Finally, defendants argue that plaintiff, concededly a public figure, has failed to make an adequate showing of malice, i.e., that defendants knew the statement was false or acted with reckless disregard as to its truth or falsity, as required by *New York Times Co. v Sullivan* (376 US 254). Clearly, since the falsity that plaintiff points to is not only that of the admission itself, i.e., that he was relieved by the prospect of losing the election, but in the fact that it was attributed to him, the relevant focus must be on whether the defendants knew, or had reason to know, that they were falsely ascribing the admission to plaintiff. In this type of defamation claim, where the defendants are aware of plaintiff's exact words and plaintiff is urging that they were falsely reported, the question of whether defendants knew their attribution was false necessarily revolves around how the defendants presented the matter to the reader. If the defendants informed the reader that they were actually quoting the plaintiff, a much stricter standard must apply than if the defendants only informed the reader that they were offering their own interpretation of the meaning of plaintiff's words.

Plaintiff argues that the defendants' knowledge should be analyzed according to the standard set forth in *Masson v New Yorker Mag.* (501 US, *supra,* at 517), which holds that, in order to establish knowledge of falsity for purposes of *New York Times Co. v Sullivan* (*supra,* at 279-280) and *Gertz v Robert Welch, Inc.* (418 US 323, 342), a party alleging that he or she was falsely quoted must show that the alteration in his or her words "result[ed] in a material change in the meaning conveyed by the statement." Although the statement at issue here, unlike the ones dealt with in *Masson,* was not surrounded by quotation marks, this does not, as defendants argue, eliminate the possibility that this standard should apply. In *Masson,* the Court referred to claims which are "analogous" to fabricated quotations (*Masson v New Yorker Mag.,* 501 US, *supra,* at 518) and indicated that the real standard is not whether quotation marks are used, but whether a reasonable reader would understand that the author was making "nearly verbatim reports of statements made by the subject" (*supra,* at 513), rather than his or her "own interpretation of an ambiguous source" (*supra,* at 519). The within statement, while not surrounded by quotation marks, used a similar device, i.e., use of the word "admits", which, like quotation marks, could convey to a reader that it was plaintiff's words, not the author's, which were being reported. Under these circumstances, we find that the statement could reasonably be read not as the author's interpretation, but as a tacit quotation, relating the actual content of plaintiff's admission.

Once the court finds a reasonable basis from which a jury could find that words were defamatory, it is for the jury to evaluate how the words would be understood by the ordinary and average reader (*James v Gannett Co.,* 40 NY2d 415, 419). Thus, in this case, we find that, in light of defendants' use of the word "admits", there is a reasonable basis from which the jury could find that the words were likely to be understood by the ordinary and average reader as a nearly verbatim report. If the jury were to make such a finding, review of the defendants' knowledge would be required under the *Masson* standard, and the jury would then be required to consider whether, by stating that plaintiff had "admit[ted]" he would be relieved to lose the election, defendants materially changed the meaning of his actual statements.[2]

We find that plaintiff has sufficiently shown by clear and

2. Plaintiff does not argue that the statement would be actionable if it were not the equivalent of a quotation, in which case the standard for judging whether any errors in reporting plaintiff's remarks were done with

convincing evidence that genuine issues of fact remain as to whether a reasonable reader would believe the statement was the equivalent of a quotation, and, if so, whether the deviation between the stated comments and the published alleged admission resulted in a material change in meaning.

Accordingly, since jury questions are presented as to whether the alleged admission was the equivalent of a quotation, and, if so, whether it constituted a material deviation from plaintiff's actual statements and, if so, whether its attribution to plaintiff was sufficient to hold him up to public contempt or ridicule, summary judgment dismissing the complaint was not warranted. Concur—Ellerin, Wallach, Kupferman and Mazzarelli, JJ.

Rosenberger, J. P., dissents in a memorandum as follows: I dissent and would affirm the grant of summary judgment to the defendants. In *Immuno AG. v Moor-Jankowski* (77 NY2d 235, 248-249, *cert denied* 500 US 954), the Court of Appeals recognized:

"that matters of free expression in books, movies and the arts generally, are particularly suited to resolution as a matter of State common law and State constitutional law, the Supreme Court under the Federal Constitution fixing only the minimum standards applicable throughout the Nation, and the State courts supplementing those standards to meet local needs and expectations (*see, e.g., People ex rel. Arcara v Cloud Books,* 68 NY2d 553, 557-558). Indeed, striking an appropriate balance 'between the need for vigorous public discourse and the need to redress injury to citizens wrought by invidious or irresponsible speech' (*Milkovich v Lorain Journal Co.,* 497 US, at [14], 110 S Ct, at 2703, *supra*), is consistent with the traditional role of State courts in applying privileges, including the opinion privilege, which have their roots in the common law (*see, Immuno AG. v Moor-Jankowski,* 74 NY2d, at 555, *supra; Cole Fisher Rogow, Inc. v Carl Ally, Inc.,* 25 NY2d 943; *Julian v American Business Consultants,* 2 NY2d 1; *Hoeppner v Dunkirk Print. Co.,* 254 NY 95, 99).

"This State, a cultural center for the Nation, has long provided a hospitable climate for the free exchange of ideas (*Matter of Beach v Shanley,* 62 NY2d 241, 255-256 [Wachtler, J., concurring]). That tradition is embodied in the free speech guarantee of the New York State Constitution, beginning with the ringing declaration that '[e]very citizen may freely speak,

"malice" would be whether the defendants' statement constituted a "rational interpretation" of plaintiff's actual words (*Time, Inc. v Pape,* 401 US 279).

write and publish * * * sentiments on all subjects.' (NY Const, art I, § 8.) Those words, unchanged since the adoption of the constitutional provision in 1821, reflect the deliberate choice of the New York State Constitutional Convention not to follow the language of the First Amendment, ratified 30 years earlier, but instead to set forth our basic democratic ideal of liberty of the press in strong affirmative terms (see, Forkosch, *Freedom of the Press: Croswell's Case*, 33 Fordham L Rev 415 [1965]).

" 'The expansive language of our State constitutional guarantee (*compare*, NY Const, art I, § 8, *with* US Const 1st Amend), its formulation and adoption prior to the Supreme Court's application of the First Amendment to the States * * * the recognition in very early New York history of a constitutionally guaranteed liberty of the press * * * and the consistent tradition in this State of providing the broadest possible protection to "the sensitive role of gathering and disseminating news of public events" * * * all call for particular vigilance by the courts of this State in safeguarding the free press against undue interference.' (*O'Neill v Oakgrove Constr.*, 71 NY2d 521, 528-529.)"

Thus, whether by the application of "interpretive" (*e.g.*, text, history) or "noninterpretive" (*e.g.*, tradition, policy) (*see*, *People v P. J. Video*, 68 NY2d 296, 302-303, *cert denied* 479 US 1091) factors, the "protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by" the Federal Constitution (*O'Neill v Oakgrove Constr.*, 71 NY2d, *supra*, at 529, n 3). This case lends itself particularly to New York State law analysis. The words complained of, "[plaintiff] admits he doesn't expect to win and is relieved by the prospect", appear not only on the editorial page of the defendants' newspaper, but within an editorial setting forth that paper's endorsements for a primary election which was to take place four days later. Here, we must determine whether the reasonable reader would believe that the statement was conveying a fact about the plaintiff. While it is true that false statements are actionable when a reasonable reader would perceive them to be factual, they "must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts." (*Immuno AG. v Moor-Jankowski*, *supra*, at 254 [emphasis in original].) That the statement appeared in an endorsement editorial is thus particularly significant.

This has been underscored by the Court of Appeals holding in *Brian v Richardson* (87 NY2d 46), decided after the instant case was argued. The Court reiterated that the context in

which a statement is published is highly significant in determining issues such as this. It observed that Op Ed pages are for ideas on matters of public concern, will represent viewpoints of authors, and will contain considerable hyperbole, speculation and opinion. This context "provided some signals to the reader that its contents were expressions of opinion." *(Supra,* at 53.) A political endorsement editorial in a newspaper is even more plainly opinion than is an Op Ed article.

In *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, 199), a case often cited and never disturbed, the Court of Appeals stated, "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."

The defendants were not grossly irresponsible. The plaintiff admits that he did not expect to win the election. He does not deny that, when asked what he would do if he won, he responded that he had two children in college, and that it would be a tremendous financial sacrifice for him, given the low salary of an Assemblyman. However, he denies that he used the word "relieved" in speaking of the prospect. "In analyzing the words in order to ascertain whether a question of fact exists for resolution upon trial, the court will not pick out and isolate particular phrases but will consider the publication as a whole [citation omitted]. The publication will be tested by its effect upon the average reader [citations omitted]. The language will be given a fair reading and the court will not strain to place a particular interpretation on the published words [citations omitted]. The statement complained of will be 'read against the background of its issuance' with respect to 'the circumstances of its publication' [citation omitted]. 'It is the duty of the court, in an action for libel, to understand the publication in the same manner that others would naturally do. "The construction which it behooves a court of justice to put on a publication which is alleged to be libellous is to be derived as well from the expressions used as from the whole scope and apparent object of the writer".' [Citations omitted.]" *(James v Gannett Co.,* 40 NY2d 415, 419-420.)

False statements of fact are only actionable where also proven to be defamatory. A defamatory statement is one which, as observed by the majority, " 'tends to expose the plaintiff to

public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society' ". (*Rinaldi v Holt, Rinehart & Winston*, 42 NY2d 369, 379, *cert denied* 434 US 969, quoting *Sydney v Macfadden Newspaper Publ. Corp.*, 242 NY 208, 211-212.) It is simply inconceivable that the substitution of the word "admits" for the word "seems" could produce such dire results.

There is a particular value to summary judgment, where appropriate, in libel cases. "Indeed, this is an additional ground for preferring the independent State law approach to one that might make summary disposition less likely * * *. [H]yper-technical parsing of a possible 'fact' from its plain context of 'opinion' loses sight of the objective of the entire exercise, which is to assure that—with due regard for the protection of individual reputation—the cherished constitutional guarantee of free speech is preserved." (*Immuno AG. v Moor-Jankowski*, *supra*, at 256.)

Since the challenged statement is a simple recasting of the plaintiff's words, not altering their plain meaning to the reasonable reader; appeared within an editorial; concerned a concededly public figure; was not grossly irresponsible; and, finally, was not defamatory, the grant of summary judgment to defendants was entirely appropriate.