[925 NYS2d 407]

SANDALS RESORTS INTERNATIONAL LIMITED, Appellant, v GOOGLE, INC., Respondent

First Department, May 19, 2011

## APPEARANCES OF COUNSEL

*Day Pitney LLP*, New York City (*David B. Newman* of counsel), for appellant.

## OPINION OF THE COURT

SAXE, J.

This proceeding seeking pre-action disclosure requires us to consider a claim of defamation arising out of an e-mail sent to multiple undisclosed recipients in which the unknown writer contrasts the financial circumstances of the people of Jamaica with that of a corporation that operates multiple resorts in Jamaica, implicitly criticizing the corporation's treatment of native Jamaicans. This appeal from an order denying the petition raises questions regarding the distinction between assertions of fact and expressions of opinion, the social context of the e-mail at issue, and anonymous e-mail communications generally.

Petitioner Sandals Resorts International seeks disclosure of information and materials that would enable it to bring a libel claim against the account holder of the Google Gmail account from which the complained-of e-mail was sent. The writer of the e-mail is identified as John Anthony, at "jft3092gmail.com"; its addressees are Betty Ann Blaine and "UNDISCLOSED RECIPIENTS." Apprehension of the contents of the e-mail is somewhat hampered by spelling and syntax errors, and because

the first page of the copy of the e-mail appended to the petition is cut off on the right-hand side, leaving gaps in its content.*

The e-mail's subject line reads: "THERE [sic] SOMETHING GRAVELY WRONG WITH THIS PICTURE OF JAMAICA ER-RRR. . . SANDALS? [sic] THE NEED FOR [gap]." The body of the e-mail intersperses comments by the writer with links to various Web sites that presumably contained information that prompted or support the writer's remarks. The gist of the e-mail is that the country of Jamaica gives subsidies to the Sandals resorts, paid for by Jamaican taxpayers, while the foreign corporation that owns the resort company hires only foreigners for its senior managerial positions and hires Jamaican nationals only for menial jobs at its Jamaican resorts.

The first line of the e-mail's body is a link to a photograph published in the Internet edition of the Jamaica Observer at its Web site, www.jamaicaobserver.com. The next line reads, "Sandals sweeps World Travel Awards in London," and is followed by the link to an article by that name, dated November 11, 2009, published at the Jamaica Observer Web site. The e-mail then proceeds with commentary prompted by that article and the images that accompanied it:

> "Jamaica the land of the Arawak and Caribs now looks like it has had a population shift like that which occurred to Egypt. At least this is [gap] the real wealth of the country is now moving to Ireland and elsewhere the rich like the Rollins bank and locals are scared stiff to ask ques [gap]

> "WHY ARE POVERTY-STRICKEN JAMAICAN TAXPAYERS SUBSIDIZING THE BILLION DOL-LAR TOURIST INDUSTRY [gap] GIVING AIR-LINE SUBSIDIES WORTH HUNDREDS OF MIL-LIONS OF DOLLARS FOR CHARITY PROGRAMS AND MENIAL [gap] OPERATIONS FOR BRING-ING IN THEIR TOURISTS FREE ESPECIALLY.

> "MAKING FOREIGN MILLIONAIRES AT JAMAI-CANS'S EXPENSE?"

The e-mail then quotes from another article (with accompanying images) published at the Jamaica Observer Web site on August 10, 2008, entitled " 'Butch' Stewart superstar!," which relates that the founder and chairman of Sandals Resorts

---

* Missing contents are indicated by the notation "[gap]."

International, Gordon "Butch" Stewart, and his son, Sandals CEO Adam Stewart, attended a reception for Canadian travel agents and tour operators. Specifically, the e-mail quotes portions of the article in which it is stated that "Butch . . . was mobbed by travel agents and tour operators hungry to meet the man who had built the brand many of them had made million [gap]" and that relate that a travel agent named "Affonso[ ] . . . disclosed that this year she had sold 90 bookings and had made over $1 million selling Sandals/ Beaches."

Following the foregoing quoted material from the article is this commentary:

> "SANDALS HAS AN EXTENSIVE OVERSEAS OPERATIONS. HOW MANY JAMAICANS WORK IN THIS VAST NETWORK? [gap] NATIONALS TO MANAGE AND RUN THEIR OVERSEAS OPERA-TIONS. I WONDER IF SANDALS IS DOING THE SAME TH [gap] COMPANY, ETC ALL FOREIGN OWNED LOCAL BASED HAVE MANAGERS FROM THE OVERSEAS HEADQUARTERED [gap] DIGICEL DOES NOT EVEN HAVE A SINGLE DARK-SKINNED JAMAICAN ON ITS BOARD!! IS IT A MATTER OF SKIN CO [gap] BUTCH THIS QUESTION? THEY ALL SEEM TO BE SCARED STIFF OF THIS MAN AND SOMEONE NEEDS TO TELL ME WH [gap]."

Next in the text of the e-mail is a link to a Web site containing an image, apparently depicting Kevin Froemming, the president of Unique Vacations, Inc., which company is part of the Sandals corporate network:

> "K. Froemming. Another millionnaire, President, Unique Vacations—laughing at us?
>
> "Unique Vacations, Inc. the Wordwide Representa-tive of Sandals and Beaches Resorts. How many Jamaican nationals work here?
>
> "MENIAL-LOW PAYING JOBS FOR JAMAICANS; HIGH PROFILE LUXURY-STYLE JOBS FOR FOR-EIGNERS!"

Directly below the foregoing is a link to an image located at the sandals.com Web site, which is followed by: "MAKING BEDS-MASSAGES JAMAICAN JOBS!," and a similar link to another image at the Sandals Web site. That is followed by:

"THE SANDALS OVERSEAS NETWORK IS WHERE THE REAL JOBS MAKING REAL MONEY IN THE SANDALS EMPIRE ARE. IT IS NOT MAKING UP BEDS IN MONTEGO BAY OR CLEANING TOILETS IN ST. LUCIA! THESE SCAIRDY CAT JAMAICANS ARE THE STRANGEST CREATURES ON THIS PLANET. AND THEY ARE THE SAME ONES WHO CRY THAT GOVERNMENT IS NOT CREATING ENOUGH JOBS . . . WHEN GOVT IS SUBSIDIZING THE TOURIST EMPIRES WITH THE TAXES OF POVERTY STRICKEN JAMAICANS WHO ARE DRINKING CORNMEAL PORRIDGE FOR SUNDAY DINNER!"

Next is the remark, "LOOK AT THIS GREAT JOB THAT WENT TO A FOREIGNER," followed by a link to an article published at www.prweb.com, entitled, "Sandals Resorts Appoints 16-Year Veteran, Dinah Marzullo, As Senior Director of Advertising," which reads, "Miami FLA [*link*] June 2, 2008—Sandals Resorts today announced the appointment of Dinah Marzullo as senior director of advertizing. Marzullo, who most recently served as advertising director at Carnival Cruise Lines, will be based out of Unique Vacations Inc. (UVI)" followed by these comments: "I AM GUESSTIMATING THAT THE SALARY FOR THIS JOB IS OVER USD$150,000 ANNUALLY. NO JAMAICAN NEED APPLY?" The next comment, "LARGE NUMBER OF JOBS! JAMAICANS EXCLUDED?," is followed by a www.sandals.com/employment link.

Finally, the remarks "ALL THE TALK ABOUT WORK PERMITS IS A RED HERRING. WHAT DO IMMIGRATION LAWYERS DO?" and "HOW MANY JAMAICANS ARE MANAGING THESE PROPERTIES? IS ANY JAMAICAN BOLD ENOUGH TO ASK BUTCH THIS?" are followed by links to sandals.com images of the various Sandals resorts in Jamaica.

Sandals contends that this e-mail is false and defamatory in asserting essentially that Sandals is racist and discriminatory in hiring non-Jamaicans for all positions of management and authority, and giving native Jamaicans only low-paying menial jobs. It therefore seeks

"all information concerning the Google account designated as jft3092gmail.com including but not limited to all e-mail, instant messages, text messages, buddy lists, address books, contact lists, ac-

count histories, account settings, profiles, mail boxes, folder structure, detailed billing, user activity records (log on and log off times), user identification records, phone number access records, ISP access records, and all information provided by the user at the time the account was created."

Pursuant to a stipulation between the parties, Google notified the account holder and provided him with a copy of the order to show cause and petition; the account holder contacted the motion court, acknowledging receipt of the documents and asserting that the publication was not defamatory.

The court denied the petition, finding that the e-mail is non-actionable opinion, because it "does not contain assertions of fact, nor would a reasonable person construe that it does." (27 Misc 3d 1207[A], 2010 NY Slip Op 50606[U], *3.)The court continued: "For the most part, the account holder enumerates queries in response to articles and pictures. The account holder provides links to the text on which his/her assertions are based." (*Id.*) These links, according to the court, provide the reader with the facts and allow the reader to arrive at his or her own conclusions, indicating to the reader "that the account holder's words are meant to provoke either thought or discussion and are therefore protected speech." (*Id.*) The court also found that the resort company "offer[ed] no evidence of the harm the account holder's [e-mail] has caused it" (*id.*) and therefore could not satisfy the "injury" element of a libel cause of action.

For the reasons that follow, we affirm.

■ Pre-action discovery is available under CPLR 3102 (c) only "where a petitioner demonstrates that [it] has a meritorious cause of action and that the information sought is material and necessary to the actionable wrong" (*see Bishop v Stevenson Commons Assoc., L.P.*, 74 AD3d 640, 641 [2010], *lv denied* 16 NY3d 702 [2011]). The petition fails to demonstrate that Sandals has a meritorious cause of action.

Defamation is defined as the making of a false statement of fact which "tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace" (*Rinaldi v Holt, Rinehart & Winston*, 42 NY2d 369, 379 [1977], *cert denied* 434 US 969 [1977] [citations omitted]). "Since falsity is a *sine qua non* of a libel claim and since only assertions of fact are capable of being proven false, . . . a libel action cannot be maintained unless it is premised on published assertions of fact," rather than on assertions of opinion (*Brian v Richardson*, 87 NY2d 46, 51 [1995]).

Initially, we observe that nothing in the petition identifies specific assertions of fact as false. That is, there is nothing in the petition contradicting the e-mail's claim that Sandals offers only menial jobs to native Jamaicans of African heritage.

■ Nor did Supreme Court err in reasoning that the failure to allege the nature of the injuries caused by the statement was fatal to the petition. While a pleading of special damages is not necessary in a case of defamation per se, there must be something that addresses the element of injury to reputation (*see Ferguson v Sherman Sq. Realty Corp.*, 30 AD3d 288, 289 [2006]). Sandals argues that portraying a plaintiff as racist constitutes libel per se, citing *Herlihy v Metropolitan Museum of Art* (214 AD2d 250 [1995]). However, where the plaintiff is a corporation, a cause of action for libel per se requires the plaintiff to establish that the publication injured its business reputation or its credit standing (*see Warehouse Willy v Newsday*, 10 AD2d 49, 51 [1960]). Thus, even accepting that the e-mail portrays petitioner as a company whose hiring decisions are informed by the applicants' race—a portrayal that certainly would be defamatory—there still must be some allegation tending to establish that its business reputation was harmed. Petitioner made no such allegation in its petition.

■ Even were we to find that the petition sufficiently alleged that the subject e-mail injured Sandals' business reputation or damaged its credit standing, we still would deny the application for disclosure of the account holder's identification on the ground that the subject e-mail is constitutionally protected opinion.

"Distinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task" (*Brian v Richardson*, 87 NY2d at 51). The approach now used in this state for determining which statements are protected opinion and which are unprotected factual assertions is based on a four-part formula enunciated in *Ollman v Evans* (750 F2d 970 [DC Cir 1984], *cert denied* 471 US 1127 [1985]; *see Immuno AG. v Moor-Jankowski*, 77 NY2d 235, 243 [1991], *cert denied* 500 US 954 [1991]). The four factors of the *Ollman* formula are: (1) whether the statement at issue has a precise meaning so as to give rise to clear factual implications (*id.* at 980), (2) the degree to which the statements are verifiable, i.e., "objectively capable of proof or disproof" (*id.* at 981), (3) whether the full context of the communication in which the statement appears signals to the reader its nature as opinion (*id.* at 982), and (4) whether

the broader context of the communication so signals the reader (*id.* at 983).

The United States Supreme Court substantially altered the last two "context" considerations of this formula in *Milkovich v Lorain Journal Co.* (497 US 1 [1990]), which decision "put[ ] an end to the perception—as it turns out, misperception—traceable to dictum in *Gertz v Robert Welch, Inc.* (418 US 323, 339-340) that . . . there is a 'wholesale defamation exemption for anything that might be labeled "opinion" ' " (*Immuno AG. v Moor-Jankowski*, 77 NY2d 235, 242 [1991], quoting *Milkovich* at 18). Concerned about difficulties it believed would be likely to arise from application of the newly eased standards of the *Milkovich* decision, the Court of Appeals in *Immuno AG. v Moor-Jankowski* announced that the New York State Constitution provides broader speech protections than does the United States Constitution under *Milkovich*. It announced that "the standard articulated and applied in *Steinhilber* furnishes the operative standard in this State for separating actionable fact from protected opinion" (*Immuno AG. v Moor-Jankowski*, 77 NY2d 235, 252 [1991], citing *Steinhilber v Alphonse*, 68 NY2d 283 [1986]).

Accordingly, the standard in this state for distinguishing protected expressions of opinion from actionable assertions of fact, as articulated in *Steinhilber*, is as follows:

> "A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based. An opinion not accompanied by such a factual recitation may, nevertheless, be 'pure opinion' if it does not imply that it is based upon undisclosed facts. When, however, the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable. The actionable element of a 'mixed opinion' is not the false opinion itself—it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking" (68 NY2d at 289-290 [citations and footnote omitted]).

Sandals views the e-mail complained of here as containing actionable false statements of fact, or an actionable statement of mixed fact and opinion, in which the anonymous writer created

the impression that Sandals engages in racist hiring practices. Sandals analogizes its claim to that of the plaintiff in *Herlihy v Metropolitan Museum of Art* (214 AD2d 250 [1995], *supra*), who asserted that museum volunteers had falsely accused her of making anti-Semitic remarks and that as a result of these false accusations she was fired. The allegedly false accusations by the volunteers included claims that plaintiff had said to them "you Jews are such liars" and "you Jews are all alike" (*id.* at 254). Since "the natural connotation of [these] statements [was] that plaintiff was anti-Semitic," a claim of slander per se was stated, and the defendants' motion for summary judgment on that cause of action was denied (*id.* at 261).

However, *Herlihy* is inapposite to Sandals' claim. Although implying that someone is racist is as libelous as representing someone as anti-Semitic, here we are not dealing with a few oral statements that each stand on their own, but with a multi-page writing. Consequently, our inquiry must address both the words and the context of the e-mail as a whole, as well as its broader social context, to determine whether the content of the e-mail constitutes defamation.

There is validity to Sandals' argument that the "natural connotation" of the e-mail is that Sandals' hiring policies are racist. Although most of the comments in the e-mail refer to "Jamaicans" and "foreigners" without reference to race or skin color, there is one specific assertion that Sandals "DOES NOT EVEN HAVE A SINGLE DARK-SKINNED JAMAICAN ON ITS BOARD," from which it is reasonable to infer that the writer is suggesting that Sandals is biased in its treatment of Jamaicans of color. It is also true, as Sandals states, that assertions of objective fact seem to be contained in the comments that Jamaicans are relegated to menial, low-paying jobs such as making beds, cleaning toilets, and giving massages, while foreigners hold "HIGH PROFILE LUXURY-STYLE JOBS," and that the government is subsidizing tourist empires with the taxes of poverty-stricken Jamaicans.

However, none of these factual assertions establishes a meritorious defamation claim.

The question of whether a defamation claim may be maintained does not turn on whether the writing contains assertions that may be understood to state facts. "[E]ven apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an audi-

ence may anticipate [the use] of epithets, fiery rhetoric or hyperbole" (*Steinhilber*, 68 NY2d at 294 [citation and internal quotation marks omitted]). Moreover, " 'sifting through a communication for the purpose of isolating and identifying assertions of fact' should not be the central inquiry" (*Guerrero v Carva*, 10 AD3d 105, 112 [1st Dept 2004], quoting *Brian v Richardson*, 87 NY2d at 51). Rather, it is necessary to consider the writing as a whole, as well as the "over-all context" of the publication, to determine "whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff" (*Brian v Richardson*, 87 NY2d at 51, quoting *Immuno AG.*, 77 NY2d at 254). "[C]ourts must consider the content of the communication as a whole, as well as its tone and apparent purpose" (*Mann v Abel*, 10 NY3d 271, 276 [2008], *cert denied* 555 US —, 129 S Ct 1315 [2009] [citations omitted]).

In *Brian v Richardson*, the Court considered an article by former United States Attorney General Elliot Richardson called *A High-Tech Watergate* that was published on the Op-Ed page of the New York Times on October 21, 1991 (87 NY2d at 48). Although the article contained assertions that the plaintiff, Dr. Earl W. Brian, was "linked to a scheme to take [Richardson's client] Inslaw's stolen software and use it to gain the inside track on a $250 million contract to automate Justice Department litigation divisions" (*id.* at 48-49 [internal quotation marks omitted]), the Court concluded that Brian's defamation claim against Richardson was properly dismissed. It explained that since "the purpose of defendant's article was to advocate an independent *governmental* investigation into the purported misuse of the software that Inslaw had sold to the Justice Department[,] . . . a reasonable reader would understand the statements defendant made about plaintiff as mere *allegations* to be investigated rather than as *facts*" (*id.* at 53).

Considering the e-mail in question here as a whole, we find that it is an exercise in rhetoric, seeking to raise questions in the mind of the reader regarding the role of Jamaican nationals in the Sandals resorts located in Jamaica. It is replete with rhetorical questions, asked either in relation to a link to an article about Sandals' companies or executives or in relation to a link to a photograph from the resorts' on-line public relations materials. Its apparent purpose is not to characterize Sandals Resorts as racist. It is to call to the reader's attention the writer's belief that the native people of Jamaica, specifically the

taxpayers, are providing financial support for the resorts on their island, but are not reaping commensurate financial rewards for that investment.

The tone of the e-mail, as well, indicates that the writer is expressing his or her personal views, in that it reflects a degree of anger and resentment at the idea that travel agents make money from the success of Sandals, and foreign nationals earn large salaries from the resorts, while native Jamaicans benefit financially only by being hired for service jobs at the resorts.

To the extent the e-mail suggests that Sandals' hiring of native Jamaicans is limited to menial and low-paying jobs, a reasonable reader would understand that as an allegation to be investigated, rather than as a fact (*see Brian v Richardson*, 87 NY2d at 53).

■ Nor does the e-mail imply that it is based upon undisclosed facts; on the contrary, each remark is prompted by or responsive to a hyperlink, that is, it is "accompanied by a recitation of the facts upon which it is based," and therefore qualifies as "pure opinion" under the *Steinhilber* analysis (68 NY2d at 289).

■ Finally, consideration of the "broader social context into which the statement fits" (*Ollman*, 750 F2d at 983) also requires the conclusion that the e-mail must be treated as an expression of the writer's views and opinions, which he is asking the reader to consider.

The culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a "freewheeling, anything-goes writing style" (*see* Cheverud, Comment, *Cohen v. Google, Inc.*, 55 NY L Sch L Rev 333, 335 [2010/2011]).

> "It is . . . imperative that courts learn to view libel allegations within the unique context of the Internet. In determining whether a plaintiff's complaint includes a published 'false and defamatory statement concerning another,' commentators have argued that the defamatory import of the communication must be viewed in light of the fact that bulletin boards and chat rooms 'are often the repository of a wide range of casual, emotive, and imprecise speech,' and that the online 'recipients of [offensive] statements do not necessarily attribute the same level of credence to the statements [that] they

would accord to statements made in other contexts.' Because the context of a statement impacts its potentially defamatory import, it is necessary to view allegedly defamatory statements published on the Internet within the broader framework on which they appear, taking into account both the tenor of the chat room or message board in which they are posted, and the language of the statements. The low barrier to speaking online allows anyone with an Internet connection to publish his thoughts, free from the editorial constraints that serve as gatekeepers for most traditional media of disseminating information. Often, this results in speech characterized by grammatical and spelling errors, the use of slang, and, in many instances, an overall lack of coherence" (O'Brien, Note, *Putting a Face to a [Screen] Name: The First Amendment Implications of Compelling ISPs to Reveal the Identities of Anonymous Internet Speakers in Online Defamation Cases*, 70 Fordham L Rev 2745, 2774-2775 [2002] [footnotes omitted]).

The observation that readers give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts specifically addresses posted remarks on message boards and in chat rooms. However, it is equally valid for anonymous weblogs, known as blogs, and it applies as well to the type of widely distributed e-mail commentary under consideration here.

Indeed, the e-mail at issue here, which questions not so much Sandals' conduct with regard to race as its use of Jamaican wealth and the Jamaican labor pool, bears some similarity to the type of handbills and pamphlets whose anonymity is protected when their publication is prompted by the desire to question, challenge and criticize the practices of those in power without incurring adverse consequences such as economic or official retaliation (*see generally* Martin, Comment and Casenote, *Freezing the Net: Rejecting a One-Size-Fits-All Standard for Unmasking Anonymous Internet Speakers in Defamation Lawsuits*, 75 U Cin L Rev 1217, 1219 [Spring 2007]; Levine, Note, *Establishing Legal Accountability for Anonymous Communication in Cyberspace*, 96 Colum L Rev 1526, 1531 [1996]). Indeed, the anonymity of the e-mail makes it more likely that a reasonable reader would view its assertions with some skepticism and tend to treat its contents as opinion rather than as fact.

This observation is in no way intended to immunize e-mails the focus and purpose of which are to disseminate injurious falsehoods about their subjects. However, we should protect against "[t]he use of subpoenas by corporations and plaintiffs with business interests to enlist the help of ISPs via court orders to silence their online critics[, which] threatens to stifle the free exchange of ideas" (Calvert et al., *David Doe v. Goliath, Inc.: Judicial Ferment in 2009 for Business Plaintiffs Seeking the Identities of Anonymous Online Speakers*, 43 J Marshall L Rev 1, 15 [Fall 2009]).

In sum, while isolated portions of the subject e-mail are arguably factual, those portions constitute facts supporting the writer's opinion, which renders the writing as a whole "pure opinion" since it does not imply that it is based upon undisclosed facts (*see Steinhilber*, 68 NY2d at 289-290). Far from suggesting that the writer knows certain facts that his or her audience does not know, the e-mail is supported by links to the writer's sources. Moreover, the "content of the whole communication, its tone and apparent purpose" (*Immuno AG.*, 77 NY2d at 254), and its very anonymity, would signal to any reasonable reader that the writer's purpose is to foment questioning by native Jamaicans regarding the role of Sandals' resorts in their national economy. Thus, the communication is not actionable.

Accordingly, the judgment of the Supreme Court, New York County (Alice Schlesinger, J.), entered April 16, 2010, dismissing the petition for pre-action discovery in an action for libel, should be affirmed, without costs. The appeal from the order, same court and Justice, entered April 30, 2010, which denied petitioner's ex parte application for reargument (incorrectly denominated an application for renewal and reargument), should be dismissed, without costs, as taken from a nonappealable order.

MAZZARELLI, J.P., McGUIRE, FREEDMAN and ABDUS-SALAAM, JJ., concur.

Judgment, Supreme Court, New York County, entered April 16, 2010, affirmed, without costs. Appeal from order, same court, entered April 30, 2010, dismissed, without costs, as taken from a nonappealable order.