**Leonard N. FLAMM, Esq.,**
**Plaintiff-Appellant,**

v.

**AMERICAN ASSOCIATION OF UNIVERSITY WOMEN and The AAUW Legal Advocacy Fund, Defendants-Appellees.**

**Docket No. 99–7085.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 29, 1999.

Decided Jan. 4, 2000.

---

Norman Mednick, New York City (Eden M. Fitzgibbons, Jill Schwartz, Leonard N. Flamm, Law Offices of Leonard N. Flamm, New York City, of counsel), for Appellant.

Laura R. Handman, New York City (Carolyn K. Foley, Davis Wright Tremaine, LLP, Michael T. Walsh, Walsh & Sheehan, LLP, New York City, of counsel), for Appellees.

Before: MESKILL, MINER and PARKER, Circuit Judges.

MESKILL, Circuit Judge:

Appellant Leonard N. Flamm, Esq., appeals a decision of the United States District Court for the Southern District of New York, Chin, *J.*, dismissing his defamation action for failure to state a claim upon which relief can be granted. The district court held that the statement challenged by Flamm was non-actionable opinion, protected under the First Amendment and the Constitution of the state of New York. However, even though appellees, who are not members of the traditional media, are entitled to constitutional protection for statements that do not imply a provably false fact, we hold that the statement challenged by Flamm can reasonably be understood to imply that he engages in the unethical solicitation of clients, an accusation that can be proven false. Therefore, we vacate the judgment and remand for further proceedings.

## BACKGROUND

Appellees American Association of University Women and the AAUW Legal Advocacy Fund (collectively "AAUW") are non-profit corporations dedicated to improving educational opportunities for women and girls. Among its other programs and services, the AAUW maintains a referral service of attorneys and other professionals who are willing to consult with women involved in higher education who have brought or are considering bringing gender discrimination actions. As part of this service, the AAUW compiles a directory of the participating attorneys and other professionals, listing names, contact information, and a short blurb about each person. In October 1997 the AAUW distributed copies of the directory, together with a cover letter, to the people listed in it, to members of the AAUW, and to any others requesting a copy.

Neither the cover letter nor the directory explained how the directory was compiled, although two of the directory entries included the notation "not reached in survey." Some of the entries appear to include statements made by the person listed. For example, Mr. K stated: "If they [cases] cannot be resolved early on, then I plan on being there for the long run, since

these cases can take 5 + years to work up, try and handle appeals." However, of the approximately 275 entries in the directory, only Flamm's contained a negative comment. His directory entry appeared as follows:

**Leonard N. Flamm**

880 Third Ave.

New York, N.Y. 10022

B–212/752–3380

H–212/755–7867

Mr. Flamm handles sex discrimination cases in the area of pay equity, harassment, and promotion. *Note: At least one plaintiff has described Flamm as an "ambulance chaser" with interest only in "slam dunk cases."*

Flamm filed suit in state court, alleging that the description "an 'ambulance chaser' with interest only in 'slam dunk cases'" constitutes libel *per se*. He sought both compensatory and punitive damages. The AAUW removed the action to federal court and filed a motion to dismiss. The district court granted the motion because it determined that the statement challenged by Flamm could not reasonably be construed as a statement of objective fact. *Flamm v. American Association of University Women*, 28 F.Supp.2d 185, 191 (S.D.N.Y. 1998).

We disagree. In light of the inclusion of the statement in an otherwise fact-laden directory, the description of Flamm as an "ambulance chaser" might imply to the reader of the directory that Flamm engages in the unethical solicitation of clients. Consequently, dismissal at this stage of the proceedings was improper.

## DISCUSSION

The central issue on appeal is whether the statement challenged by Flamm is protected by either the United States Constitution or the New York Constitution. Constitutional limits on common law defamation actions were initially identified in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), when the Supreme Court held that a public official could not recover for libel absent a showing of "actual malice" by the newspaper publisher. Since then, federal and state courts have struggled to define the scope of constitutional privilege in defamation law. Of particular importance here is the Supreme Court's decision in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), where the Court stated: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* at 339–40, 94 S.Ct. 2997. The Court's opinion in *Gertz* was widely understood to extend an "absolute constitutional protection" to expressions of opinions. *See, e. g., Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289–90, 508 N.Y.S.2d 901, 904, 501 N.E.2d 550, 553 (1986).

Subsequently, however, the Supreme Court disclaimed "an additional separate constitutional privilege for 'opinion'" under the First Amendment. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). The Court disapproved of the various tests used by the lower courts to distinguish fact from opinion, tests which developed from a "mistaken reliance on the *Gertz* dictum." *Id.* at 19, 110 S.Ct. 2695. Instead, the Court explained that existing constitutional principles were adequate to secure "the breathing space which freedoms of expression require in order to survive." *Id.* (internal quotations omitted).

In response, the Court of Appeals of New York grounded its pre-*Milkovich* protection for expressions of opinion in the New York Constitution. *See Immuno AG. v. Moor–Jankowski*, 77 N.Y.2d 235, 248–52, 566 N.Y.S.2d 906, 913–16, 567 N.E.2d 1270, 1277–80 (1991). In its decision, the court reaffirmed that "the standard articulated and applied in *Steinhilber* furnishes the operative standard in this State for separating actionable fact from protected

opinion." *Id.* at 252, 566 N.Y.S.2d at 916, 567 N.E.2d at 1280. To resolve this appeal we must test the statement challenged by Flamm against the standards set by both the First Amendment and the New York Constitution. Although the analysis "does and is intended to differ," the dispositive inquiry here is the same: whether the challenged statement can reasonably be construed to be stating or implying facts about the defamation plaintiff. *See Levin v. McPhee,* 119 F.3d 189, 196 (2d Cir.1997); *600 West 115th St. Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825, 829, 603 N.E.2d 930, 934 (1992).

## I. *The Federal Standard*

■■■ In defamation suits against media defendants, a statement that involves a matter of public concern must be provable as false before liability can be established. *Milkovich,* 497 U.S. at 19–20, 110 S.Ct. 2695. This follows directly from *Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), which requires defamation plaintiffs to bear the burden of proving falsity in suits against media defendants that involve matters of public concern. *Id.* at 776–77, 106 S.Ct. 1558. The *Milkovich* Court did not decide, however, whether the same rules apply in suits against nonmedia defendants. *See Milkovich,* 497 U.S. at 20 n. 6, 110 S.Ct. 2695 (leaving open the question reserved in *Hepps* ). The parties in our case did not address the issue of whether *Milkovich* applies, apparently assuming that it does, even though they disagreed at oral argument as to the burden of proving truth or falsity. Because the issue involves a question of law that is likely to arise on remand, we consider it here.

The distinctions found in the law of defamation—between matters of public and private concern, between media and nonmedia defendants, and between public officials or public figures and private plaintiffs—were enunciated in an attempt to balance "the State's interest in compensating private individuals for injury to their reputation against the First Amendment interest in protecting ... expression." *See, e. g., Dun & Bradstreet v. Greenmoss Builders,* 472 U.S. 749, 757–61, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985); *see also Gertz,* 418 U.S. at 341–48, 94 S.Ct. 2997. In *Gertz,* the plaintiff sought to recover against the publisher of a magazine article that described the plaintiff as a "Leninist" and a "Communist-fronter." The district court granted judgment to the defendant on the ground that the plaintiff failed to establish actual malice. The court applied the actual malice standard, even though the plaintiff was not a public official or a public figure, because the article concerned a matter of public interest. The judgment was affirmed on appeal. The Supreme Court, however, reversed. The Court refused to extend the holding of *New York Times* to include cases involving matters of "general or public interest," as suggested by the plurality in *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). *Gertz,* 418 U.S. at 346, 94 S.Ct. 2997. Such an extension would "abridge [the] legitimate state interest" in fashioning a "legal remedy for defamatory falsehood injurious to the reputation of a private individual." *Id.* The Court also warned against "forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not—to determine, in the words of Mr. Justice Marshall, 'what information is relevant to self-government.' " *Id.* (quoting *Rosenbloom,* 403 U.S. at 79, 91 S.Ct. 1811 (dissenting opinion)). Instead, the Court held that, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. 2997. The Court also held that "States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth,"

*i.e.,* actual malice. *Id.* at 349, 94 S.Ct. 2997.

The Court re-examined *Gertz* in *Dun & Bradstreet,* 472 U.S. at 756–61, 105 S.Ct. 2939. In *Dun & Bradstreet,* a defamation action against a credit reporting agency, the plaintiff was awarded compensatory or presumed damages and punitive damages by the jury. The state trial court granted a new trial after the defendant challenged the award under *Gertz.* On appeal, the Vermont Supreme Court reversed. The court acknowledged that a distinction between media defendants and nonmedia defendants would not always be easy to draw, but nonetheless concluded that the constitutional protection of *New York Times* did not extend to nonmedia defendants such as Dun & Bradstreet.

The Supreme Court affirmed on different grounds. Although there was no opinion for the Court, a majority of justices agreed that the *Gertz* rule requiring a showing of actual malice to support recovery of presumed or punitive damages does not apply to cases involving matters of only private concern. The plurality opinion explained: "It is speech on 'matters of public concern' that is 'at the heart of the First Amendment's protection.' ... In contrast, speech on matters of purely private concern is of less First Amendment concern." *Id.* at 758–59, 105 S.Ct. 2939 (quoting *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (internal quotations omitted)); *see also id.* at 764, 105 S.Ct. 2939 (Burger, *C. J.,* concurring) ("*Gertz* is limited to circumstances in which the alleged defamatory expression concerns a matter of general public importance."); *id.* at 774, 105 S.Ct. 2939 (White, *J.,* concurring).

Significantly, the plurality opinion and the concurring opinions declined to adopt the media/nonmedia distinction drawn by the state court, and that distinction was expressly rejected by the four dissenting justices and by Justice White. *See id.* at 781–84, 105 S.Ct. 2939 (dissenting opinion);

*id.* at 773, 105 S.Ct. 2939 (White, *J.,* concurring). "Such a distinction is irreconcilable with the fundamental First Amendment principle that '[t]he inherent worth of ... speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.' First Amendment difficulties lurk in the definitional questions such an approach would generate. And the distinction would likely be born an anachronism." *Id.* at 781–82, 105 S.Ct. 2939 (Brennan, *J.,* dissenting) (quoting *First National,* 435 U.S. at 777, 98 S.Ct. 1407) (citation and footnotes omitted); *see also Don King Prods. v. Douglas,* 742 F.Supp. 778, 782 n. 4 (S.D.N.Y.1990).

We agree that a distinction drawn according to whether the defendant is a member of the media or not is untenable. However, we need not extend the constitutional safeguards of *Hepps* and *Milkovich,* which involved media defendants, to every defamation action involving a matter of public concern. Rather, in a suit by a private plaintiff involving a matter of public concern, we hold that allegedly defamatory statements must be provably false, and the plaintiff must bear the burden of proving falsity, at least in cases where the statements were directed towards a public audience with an interest in that concern. *See Unelko Corp. v. Rooney,* 912 F.2d 1049, 1056 (9th Cir.1990); *compare Dun & Bradstreet,* 472 U.S. at 762, 105 S.Ct. 2939.

This approach, akin to a "common interest" privilege for matters of public concern, balances the competing values at stake. On the one hand, the state interest in compensating private individuals for wrongful injury to reputation is significantly weaker "when the factfinding process [is] unable to resolve conclusively whether the speech is true or false; it is in those cases that the burden of proof is dispositive." *See Hepps,* 475 U.S. at 776, 106 S.Ct. 1558. On the other hand, the First Amendment interest in protecting free expression is advanced by requiring private

plaintiffs to prove the falsity of allegedly defamatory statements involving matters of public concern, especially when the challenged statements are directed towards a public audience with an interest in that concern.

■ Turning to the case at bar, whether a publication addresses a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see also Dun & Bradstreet*, 472 U.S. at 761, 105 S.Ct. 2939. Gender discrimination is a problem of constitutional dimension, and the efforts of the AAUW to combat it clearly relate to a matter of public concern. The purported allegation that Flamm, an attorney specializing in the field, engages in the unethical solicitation of victims of gender discrimination is also a matter for public concern, especially when brought to the public's attention by way of a publication with the imprimatur of the AAUW. *See Unelko*, 912 F.2d at 1056 (holding statements about product effectiveness aired on "60 Minutes" to be matter of public concern). Indeed, the common law recognizes that publications commenting on "persons who present[ ] themselves or their services or goods to the public" are matters of public concern. 1 Robert D. Sack, *Sack on Defamation* § 4.4.4 (3d ed.1999); *see also* W. Page Keeton, *Prosser and Keeton on Torts* § 115 at 832 (5th ed.1984). The directory was also distributed to a public audience with an interest in issues of gender discrimination. It was mailed, at a minimum, to hundreds of Flamm's peers and fellow professionals nationwide. This mailing was clearly intended to, and can reasonably be viewed as an attempt to, influence public discourse and affect the public response to incidents of gender discrimination.

For the foregoing reasons we conclude that, to survive this motion to dismiss, Flamm must have shown that a reasonable person could find that the challenged statement alleges or implies a provably false fact. We conclude that he has.

■ In *Milkovich*, the Supreme Court held that there is no separate constitutional privilege for statements of opinion under the First Amendment. Instead, the Court explained, "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Milkovich*, 497 U.S. at 19, 110 S.Ct. 2695 (citing *Hepps* ). Furthermore, liability may not be based on "statements that cannot reasonably be interpreted as stating actual facts about an individual," including statements of "imaginative expression" or "rhetorical hyperbole." *Id.* at 20, 110 S.Ct. 2695 (citing *Hustler Magazine v. Falwell*, 485 U.S. 46, 50–55, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)) (alterations and internal quotations omitted). A court may also consider whether the "general tenor" of the publication negates the impression that challenged statements imply defamatory facts about the plaintiff. *See id.* at 21, 110 S.Ct. 2695.

In *Milkovich*, a high school wrestling coach sued a local newspaper and one of its reporters on the basis of a published sports column. Milkovich alleged that the headline and nine sentences from the column accused him of perjury. The state courts granted summary judgment for the defendant on the ground that the article was "constitutionally protected opinion." The Court reversed, stating the dispositive question to be whether the challenged statements could reasonably be understood to imply that the plaintiff had committed perjury. *Id.* The Court answered the question in two steps: whether the challenged statements reasonably imply the alleged defamatory meaning; and if so, whether that defamatory meaning is capable of being proven false.

First, the Court recognized that the "clear impact" of the headline and the nine sentences was that " '[Milkovich] lied at the hearing ... after having given his solemn oath to tell the truth.' " *Id.* (quot-

ing *Scott v. News–Herald,* 25 Ohio St.3d 243, 251, 496 N.E.2d 699, 707 (1986) (internal quotations omitted)). The Court found that the language used was "not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that [Milkovich] committed the crime of perjury. Nor [did] the general tenor of the article negate this impression." *Id.* Second, the Court found that "the connotation that [Milkovich] committed perjury [was] sufficiently factual to be susceptible of being proved true or false." *Id.* The Court observed that whether Milkovich was guilty of perjury could be determined based on "a core of objective evidence." *Id.*

Flamm alleges in his complaint that his description in the AAUW directory as an "ambulance chaser" states that he "has engaged in improper activities to solicit and obtain clients." Following *Milkovich,* we must decide whether the description of Flamm as an "ambulance chaser" reasonably implies that he has engaged in unethical solicitation, and if so, whether the accusation of unethical solicitation is capable of being proven false. The second question, however, is conceded by the defendants. They admit that the term "ambulance chaser" is provable as true or false when understood literally to accuse a lawyer of the unethical or criminal behavior of solicitation.

We conclude that the statement challenged by Flamm reasonably implies that he has engaged in unethical solicitation. The directory in all other respects states facts: names, addresses and phone numbers; a note that Ms. R "will not be able to consult with anyone affiliated with the Florida State University system because of a conflict of interest"; the warning that Mr. A "charges a $50.00 initial consultation fee and does not discuss potential cases over the phone"; and so on. Furthermore, the directory has the stated purpose of providing referrals to qualified attorneys and professionals to assist victims of

gender discrimination. A reader of the directory, seeing the only negative comment among several hundred entries, would likely turn elsewhere for assistance. Indeed, the note about Flamm is highlighted in italics, suggesting that it warrants special attention and consideration.

The AAUW points to *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (hereinafter, *Letter Carriers* ), and suggests that " 'ambulance chaser' is as to lawyers, as 'scab' is to anti-union forces: language of commonplace epithet which is not actionable." In *Letter Carriers* the Court reviewed a libel judgment based on a newsletter that identified the plaintiffs as "scabs" and that reprinted "The Scab," a piece of trade union literature by Jack London defining a "scab" to be, *inter alia,* a traitor. The Court held that the judgment could not be sustained. *See id.* at 282–83, 94 S.Ct. 2770. After observing that naming the plaintiffs as scabs was "literally and factually true," the Court rejected the plaintiffs' argument that the newsletter could "be read to charge them with having 'rotten principles,' with lacking 'character,' and with being 'traitor[s].' " *Id.* at 283, 94 S.Ct. 2770. The Court did not rule that such "common-place epithets" are not actionable. Indeed, it warned that such language could be actionable, "particularly if . . . used in such a way as to convey a false representation of fact." *Id.* at 286, 94 S.Ct. 2770.

The Court found instead that "the only factual statement in the disputed publication is the claim that appellees were scabs" and that "[t]he definition's use of words like 'traitor' cannot be construed as representations of fact." *Id.* at 284, 94 S.Ct. 2770. The Court observed that the language in Jack London's "The Scab" was used in a "loose, figurative sense" and that it would be "impossible to believe" that any reader understood the newsletter to be charging the plaintiffs with treason. *Id.* at 284–85, 94 S.Ct. 2770. In other

words, even the use of the word "traitor" could not reasonably imply that the plaintiffs were, in fact, being accused of treason. *See also Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (finding it "impossible to believe" that readers of a newspaper article reporting statements made at public hearings would understand "blackmail" to be charging plaintiff with a crime). Here, however, we do not think it would be "impossible to believe" that the description of Flamm as an "ambulance chaser" implies that he engages in unethical solicitation. More to the point, it would not be unreasonable to think so, even if "ambulance chaser" is a figurative way to describe it. Exaggerated rhetoric may be commonplace in labor disputes, but a reasonable reader would not expect similar hyperbole in a straightforward directory of attorneys and other professionals. Indeed, the opposite is true. A reasonable reader is more likely to treat as fact the description of Flamm as an "ambulance chaser" because there is nothing in the otherwise fact-laden directory to suggest otherwise.

Next, the AAUW contends that the phrase "with interest only in 'slam dunk cases' " indicates that the challenged statement cannot be read literally, because "slam dunk" is an imprecise term of slang suggesting that the entire statement amounts to a purely subjective judgment. There is little merit to this argument. Even if the "slam dunk" language might cause a reasonable reader to consider whether the entire statement was merely an informal complaint, we cannot say that it would be unreasonable to conclude otherwise. The description "an 'ambulance chaser' with interest only in 'slam dunk cases' " can reasonably be interpreted to

mean an attorney who improperly solicits clients and then takes only easy cases. This reading, which separates to a degree the "ambulance chaser" characterization from the "slam dunk cases" language, is especially plausible because, in the challenged statement as printed, each of those phrases was separately enclosed in quotation marks. It would not be unreasonable to read the "ambulance chaser" excerpt literally, because it could have been unrelated to the "slam dunk cases" reference in whatever passage the AAUW was quoting.[1]

■ Similarly, with respect to the prefix "[a]t least one plaintiff," it would not be unreasonable for a reader to believe that the AAUW would not have printed such a statement without some factual basis and to conclude that the statement did indeed state facts about Flamm. The directory was, in all other respects, purely factual. Nothing in the directory suggested that it might be a forum for the unsubstantiated complaints of a single plaintiff. Furthermore, "the fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character." *Brian v. Richardson,* 87 N.Y.2d 46, 54, 637 N.Y.S.2d 347, 352, 660 N.E.2d 1126, 1131 (1995). The mere recitation of prefatory phrases such as "in my opinion" or "I think" will not render innocent an otherwise defamatory statement. *See, e. g., Milkovich,* 497 U.S. at 18–19, 110 S.Ct. 2695; *see also Masson v. New Yorker Magazine,* 501 U.S. 496, 522, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (holding that report of colleagues' opinion that plaintiff was an "intellectual gigolo" could be defamatory).

---

1. The district court opined that "[t]he most likely interpretation of the statement is that at least one person was referred to Flamm and that Flamm refused to take her case, not because he acted unethically or was 'chasing ambulances,' but because he was not interested in accepting what was not a 'slam dunk case.' " *Flamm,* 28 F.Supp.2d at 191. Even if we agreed with this reading, which elides the "ambulance chaser" reference, it misstates the relevant inquiry. We must ask whether the alleged interpretation is reasonable, not whether it is "most likely." *See Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695.

The AAUW also argues that "ambulance chaser" cannot be read in the literal sense of a lawyer who "has engaged in improper activities to solicit and obtain clients" because dictionary definitions of "ambulance chaser" typically refer to solicitation of negligence or accident victims. *See, e. g., Black's Law Dictionary* 80 (7th ed.1999); *Webster's Ninth Collegiate Dictionary* 77 (9th ed.1984). This peculiar argument, challenging the alleged meaning of "ambulance chaser" as overly literal because not literal enough, is without merit. Although "rhetorical hyperbole" and "lusty and imaginative expression" may not be actionable, *see Letter Carriers,* 418 U.S. at 286, 94 S.Ct. 2770, there is at the same time no requirement that the defamatory meaning of a challenged statement correspond to its literal dictionary definition. It is sufficient, for the purpose of defeating this motion to dismiss, that the challenged statement reasonably implies the alleged defamatory meaning.

We therefore hold that the challenged statement is "reasonably susceptible to the defamatory meaning imputed to it." *See Levin,* 119 F.3d at 195 (citing *James v. Gannett Co.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837–38 (1976)). However, it remains for the jury to decide whether the challenged statement was likely to be understood by the reader in a defamatory sense. *Id.*

In sum, the AAUW's contention that the term "ambulance chaser" was mere hyperbole falls short. Considering the "general tenor" of the publication—a directory for referrals put out by a national professional organization—it would not be unreasonable to think that the description of Flamm conveyed an assertion of fact. Thus, the challenged statement reasonably implies a defamatory fact capable of being proven false, and the AAUW is not entitled to dismissal under the First Amendment.

## II. *The New York Standard*

In New York, the courts employ a flexible approach in distinguishing actionable fact from non-actionable opinion. Three factors are generally considered: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to 'signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact.' " *Gross v. New York Times Co.,* 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 817, 623 N.E.2d 1163, 1167 (1993) (quoting *Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d at 905, 501 N.E.2d at 554). These criteria apply whether the defendant is a member of the media or not. *See 600 West 115th St.,* 80 N.Y.2d at 145, 589 N.Y.S.2d at 833, 603 N.E.2d at 938 (applying *Steinhilber* in defamation action brought by lessee against resident); *cf.* 1 *Sack on Defamation* § 4.2.4.3 (suggesting that protection for opinion based on pre-*Milkovich* jurisprudence is broader and not limited by questions reserved in *Hepps* ).

The Court of Appeals of New York has made clear, however, that a proper analysis should not consist of a mechanical enumeration of each factor adopted in *Steinhilber.* Instead, "the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff.' " *Brian,* 87 N.Y.2d at 51, 637 N.Y.S.2d at 351, 660 N.E.2d at 1130 (quoting *Immuno AG.,* 77 N.Y.2d at 254, 566 N.Y.S.2d at 917, 567 N.E.2d at 1281).

Since *Steinhilber,* the Court of Appeals of New York has consistently focused its analysis on the overall context in which the complained-of assertions were made. *See Brian,* 87 N.Y.2d at 53, 637 N.Y.S.2d at 351, 660 N.E.2d at 1130 (statements pub-

lished on op-ed page of newspaper); *Gross,* 82 N.Y.2d at 155–56, 603 N.Y.S.2d at 819, 623 N.E.2d at 1169 (accusation made in the course of a lengthy, copiously documented newspaper series); *Immuno AG.,* 77 N.Y.2d at 252, 566 N.Y.S.2d at 916, 567 N.E.2d at 1280 (letter to the editor of a scientific journal); *see also Steinhilber,* 68 N.Y.2d at 293, 508 N.Y.S.2d at 906, 501 N.E.2d at 554–55 (examining first "the content of the whole communication as well as its tone and its apparent purpose"). The *Immuno AG.* Court only subsequently analyzed the presence of specific language, *e. g.,* the use of "appeared to be," "might well be," "could well happen," and "should be" to signal presumptions and predictions rather than facts. *See Immuno AG.,* 77 N.Y.2d at 255, 566 N.Y.S.2d at 917, 567 N.E.2d at 1281.

▄ In the present case, the challenged language appears in a national directory nearly seventy pages in length, compiled and distributed by a reputable professional organization with a 100 year history of supporting education. The directory purports to list "attorneys and other specialists" willing to consult with women involved in higher education who are seeking redress for sex-based discrimination. The directory provides names, addresses, phone numbers and, generally, a short statement of the person's area of interest or expertise. In such a fact-laden context, the reasonable reader would be "less skeptical and more willing to conclude that [the directory] stated or implied facts." *Gross,* 82 N.Y.2d at 156, 603 N.Y.S.2d at 819, 623 N.E.2d at 1169 (alterations and internal quotations omitted).

The cases cited by the AAUW are unavailing, involving situations (unlike the situation here) that suggest that the alleged defamations should not be understood to be stating facts. *See Steinhilber v. Alphonse,* 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986) (phone message and banner in labor dispute); *Shinn v. Williamson,* 225 A.D.2d 605, 639 N.Y.S.2d 105 (2d Dep't 1996) (epithets on jacket cover of rap album); *Ram v. Moritt,* 205 A.D.2d 516, 612 N.Y.S.2d 671 (2d Dep't 1994) (statements made while repossessing medical equipment); *DRT Constr. Co. v. Lenkei,* 176 A.D.2d 1229, 576 N.Y.S.2d 724 (4th Dep't 1991), *app. denied,* 79 N.Y.2d 753, 581 N.Y.S.2d 281, 589 N.E.2d 1263 (1992) (flyers opposing development plans); *see also Golub v. Esquire Publ'g,* 124 A.D.2d 528, 508 N.Y.S.2d 188 (1st Dep't 1986), *app. denied,* 69 N.Y.2d 606, 514 N.Y.S.2d 1023, 507 N.E.2d 319 (1987) (description of plaintiff as "loose-tongued lawyer" did not convey impression that plaintiff betrayed client confidences but only that plaintiff enjoyed talking about himself). In the case that comes closest to supporting the AAUW's position, *Polish Am. Immig. Relief Comm. v. Relax,* 189 A.D.2d 370, 596 N.Y.S.2d 756 (1st Dep't 1993), the court relied on a decision that subsequently was reversed by the Court of Appeals of New York. *See id.* at 374, 596 N.Y.S.2d at 759 (relying on *Gross v. New York Times Co.,* 180 A.D.2d 308, 587 N.Y.S.2d 293 (1st Dep't 1992), *rev'd,* 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993)). In any event, the statements published by the defendants in that case, made by a disgruntled immigrant, were far more suggestive of mere individual opinion than the relatively unadorned characterization here of Flamm as an "ambulance chaser."

Finally, the district court held that the phrase "with interest only in 'slam dunk cases'" rendered the entire statement so informal as to lack a precise and readily understood meaning. Although acknowledging that "'ambulance chaser' standing alone may have a precise meaning," and indeed, *"does* have a specific meaning, particularly among lawyers and professionals," the court focused on the "slam dunk" language. *See Flamm,* 28 F.Supp.2d at 189–90. The court reasoned that "an 'ambulance chaser' is not someone who is interested only in 'slam dunk cases,' but rather, he is someone who is much less selective and who must 'chase' after cases." *Id.* at 190. We do not agree.

There is nothing inherently inconsistent about an "ambulance chaser" interested only in "slam dunk" cases. To accuse Flamm of improper solicitation—but only of easy cases—is still to accuse him of improper solicitation.

The AAUW's other arguments were considered previously and rejected in our discussion of First Amendment privilege. Consequently, the AAUW is not entitled to dismissal at this stage of the litigation.

## CONCLUSION

As noted earlier, it remains for the jury to decide whether the challenged statement was in fact understood in a defamatory sense. Furthermore, the AAUW may rely on the other constitutional protections reviewed in *Milkovich*, including the requirements that Flamm establish both fault and falsity. However, because the statement challenged by Flamm reasonably can be understood to imply that he engages in unethical solicitation, he is entitled to continue with this action and the district court's decision cannot stand. We vacate the judgment and remand for further proceedings not inconsistent with this decision.