INSIDE RADIO, INC., et ano., Plaintiffs,

v.

CLEAR CHANNEL COMMUNICATIONS, INC., Defendant.

Clear Channel Communications, Inc., Plaintiff,

v.

Inside Radio Inc., Defendant.

Nos. 01 CIV. 6645(LAK), 02 CIV. 1345(LAK).

United States District Court, S.D. New York.

July 3, 2002.

Ronald J. Rosenberg, Edward M. Ross, Kenneth A. Aneser, Rosenberg Calica & Birney LLP, Garden City, NY, for Inside Radio, Inc. and Gerard Del Colliano.

Richard S. Mandel, Cowan, Liebowitz & Latman, P.C., New York City, for Clear Channel Communications, Inc.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This in substance is an appeal from the order of Magistrate Judge Gabriel W. Gorenstein of May 16, 2002, which order in substantial part denied the application of Clear Channel Communications, Inc. ("CCC") for an order compelling Inside Radio, Inc., and its principal, Gerard Del Colliano (collectively, "IRI"), to disclose confidential sources of news stories at issue in this case.

### I

*Background*

CCC owns and operates radio stations, including several in the New York market. IRI publishes a newsletter, distributed over the Internet and in other ways, called *Inside Radio,* which purports to bring its readers "inside" news concerning the radio broadcasting business. CCC publishes its own industry newsletter, called *InsideInside Radio,* which purports to contain news and commentary concerning the operations and motives of *Inside Radio.*

The relationships among these parties perhaps might be characterized as a twenty-first century blood feud. *Inside Radio* has published any number of stories concerning CCC

that have disturbed CCC considerably. CCC maintains, it appears, that it has done so in furtherance of a plan by IRI to defame and harass CCC to such an extent that CCC will acquire *Inside Radio* at a rich price satisfactory to IRI. Its publication of *InsideInside Radio* is a response to what CCC characterizes as "terrorism" by IRI. It has been highly critical, to say the least, of the veracity and journalistic ethics employed in IRI's publication of *Inside Radio,* accusing IRI, among other things, of making up false and defamatory stories about CCC as part of the alleged extortion scheme.

IRI has not taken this lying down. The first of the two captioned actions contends, *inter alia,* that CCC has libeled IRI by publishing any number of false statements about IRI in *InsideInside Radio.*[1]

Among IRI's major complaints is its assertion that CCC's claims that IRI knowingly published false stories, that it suggested that it had confidential sources for its stories when in fact it did not, and that it simply made up defamatory material about CCC themselves are false. Not surprisingly, CCC seeks to establish the identity of and obtain discovery concerning confidential sources purportedly used by IRI in reporting various *Inside Radio* stories about CCC, this in furtherance of its contention that Inside Radio, Inc. and Del Colliano are every bit as unethical as CCC claims and that they have made up false stories about CCC. When IRI balked and asserted journalistic privilege to avoid such disclosure, the issue came before the magistrate judge.

In proceedings before the magistrate judge, IRI sought to narrow its claim in an effort to avoid premising its suit on statements in *InsideInside Radio* that could be proved true or false only by identifying a supposed confidential source and thus to moot CCC's demand.[2] The IRI claim, as modified, now rests on the statements set forth at pages 2 through 13 of Plaintiffs' Supplemental Responses to Defendant's Second Set of Interrogatories, dated April 23, 2002 (hereinafter "Supplemental Responses").[3]

*The Ruling*

In his bench ruling of May 16, 2002, the magistrate judge applied the standard well established in this Circuit to efforts to obtain journalists' confidential sources. He held that "to protect the interests of the reports and the public in preserving the confidentiality of journalists' sources, . . . disclosure may be ordered only upon [a] clear and specific showing that the information is highly material and relevant, necessary, or critical to the maintenance of the claim and not obtainable from other sources."[4] He acknowledged that a reporter "does not waive the privilege merely by bringing suit."[5] Rather, "the privilege is waived when the reporter puts those confidential sources at issue in a suit. Then the test becomes whether the privileged communication is of critical relevance to the defendant's defense."[6] He then applied that standard to the statements relied upon by IRI in support of its defamation and libel claim, as modified by its Supplemental Responses. He concluded that IRI had succeeded in eliminating reliance on all but two

---

1. The second amended complaint contains over ten single-spaced pages of allegedly false and defamatory statements. Sec. Am. Cpt. 9–21.

2. By way of hypothetical illustration, suppose *Inside Radio* reported that a confidential source had told it that CCC had fired someone because he had been accused of malfeasance. Suppose further that *InsideInside Radio* then reported that, although the employee actually had left the company, the *Inside Radio* story was false both because the employee had not been fired and because *Inside Radio* actually had no confidential source, and that it maliciously made up the story to harass CCC. If IRI premised a libel claim on that *InsideInside Radio* story, the existence *vel non* of the claimed confidential source and the

substance of what any such source had told IRI both would be relevant to CCC's defense that the *InsideInside Radio* story was true. By withdrawing claims based on publications it regarded as analogous to this hypothetical example, IRI sought to moot the confidential source issue.

3. Plaintiffs' Response to Clear Channel's Objections to Magistrate Judge Gorenstein's Order Denying Discovery of Plaintiffs' Confidential News Sources (hereinafter "Pl. Resp."), Ex. 5.

4. Pl. Resp., Ex. 2, at 2–3.

5. *Id.* at 3.

6. *Id.*

statements in *InsideInside Radio* concerning which disclosure of IRI's sources would be of "critical relevance" to CCC's defense of truth.[7] He ruled further that CCC would be entitled to discovery of confidential sources with respect to those two statements unless IRI withdrew its reliance upon them.[8] CCC now objects to the ruling insofar as it denied CCC's application to compel discovery of confidential sources with respect to the statements enumerated in IRI's Supplemental Responses.

## II

CCC argues that the decision below was incorrect as a matter of law and clearly erroneous in that the supposed modification of IRI's claim in fact did not eliminate the need for discovery of IRI's confidential sources.[9]

### A. The Legal Standards

#### 1. Scope of Review

The order of a magistrate judge will be sustained unless it is "clearly erroneous or contrary to law."[10] Magistrate judges, moreover, are "afforded broad discretion" in resolving discovery disputes, and their resolution of such issues will be overturned only if that discretion is abused.[11] A decision premised on an erroneous legal principle, however, is an abuse of discretion.[12]

#### 2. Journalist's Privilege

There is little doubt that a journalist's privilege exists and applies in this case. Federal courts have recognized the existence of such a privilege, resting at least in part on the First Amendment.[13] Both New York and New Jersey, the law of one of which probably will govern here, have statutory shield laws.[14] To the extent the privilege is of constitutional dimension, the Constitution of course controls. To the extent, if any, that it draws content from other sources, it is governed in this case, which involves both federal and state law claims, "by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."[15] Indeed, neither side disputes this. Rather, the controversy is over whether and to what extent IRI has waived the privilege by pursuing its remaining claims.

#### a. Waiver Standard

■ While CCC seems to claim that the magistrate judge applied an incorrect legal standard in deciding the waiver question, its papers do not make clear what the error allegedly was. The clearest statement, perhaps, is in its reply brief, where it argues that there was a waiver here because "the existence, identity and reliability of plaintiffs' supposed conditional sources goes to the

7. *See id.* at 4–9.

8. *See id.* at 4–5.

9. While there perhaps is some suggestion in CCC's opening papers that it contends that IRI waived the privilege simply by bringing suit, a careful reading of those papers, as well as the clear terms of its reply brief (p. 2), demonstrate that its claim is not that ambitious. Rather, it contends only that the magistrate judge erred in concluding that the existence of confidential sources and the substance of their communications to IRI no longer were at issue except in the two respects referred to above.

10. 28 U.S.C. § 636(b)(1)(A).

11. *E.g., Citicorp v. Interbank Card Ass'n,* 478 F.Supp. 756, 765 (S.D.N.Y.1979).

12. *Cf., e.g., In re Certain Underwriter,* 294 F.3d 297, 301 (2d Cir.2002) (noting, in the context of

review of district court's denial of motion to recuse, that "'[a]n error of law ... would constitute an abuse of discretion'") (quoting *Beal v. Stern,* 184 F.3d 117, 122 (2d Cir.1999)); *S.E.C. v. TheStreet.Com,* 273 F.3d 222, 229 n. 6 (2d Cir. 2001) ("A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding.").

13. *See, e.g., Gonzales v. Nat'l Broad. Co.,* 194 F.3d 29, 33–35 (2d Cir.1999); *von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 141–43 (2d Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

14. N.J.S.A. § 2A:84A–21 (West 2002); N.Y. Civ. Rights L. § 79–h (McKinney 2002).

15. Fed. R. Evid. 501; *von Bulow,* 811 F.2d at 141; *Johnson v. Nyack Hosp.,* 169 F.R.D. 550, 557 (S.D.N.Y.1996).

heart of [CCC's] defense in this case and readily satisfies the requirements for an 'at issue' waiver." [16]  But it cites no authority for the proposition that this is the applicable standard, and the only cases it does cite do not stand for the principle that a journalist waives its privilege by asserting a claim such that identity and related information concerning its confidential sources "goes to the heart of [the] defense." [17]

The Second Circuit has made clear that disclosure of a journalist's sources:

> "may be ordered only upon a clear and specific showing that the information is: [1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other available sources." [18]

Thus, it is not enough that the source information be "highly material and relevant"— *i.e.*, that it "go[ ] to the heart of [the] defense." The party seeking such discovery must show also that it is critical to the claim *and* that it is not obtainable from other sources. And this is precisely the standard that the magistrate judge applied. In consequence, the contention that the judge below applied an incorrect legal standard, if indeed CCC so contends, simply is wrong.

### b. Application of the Standard

The question thus becomes whether the judge below erred in applying this standard to IRI's remaining claims. In doing so, it is useful to start with the first of the articles at issue, despite the fact that the claims with respect to that article are not the broadest that IRI makes, because the first article so well illustrates the analysis.

16. Def. Reply Mem. 2.

17. The cases upon which CCC relies are *Driscoll v. Morris*, 111 F.R.D. 459 (D.Conn.1986), and *Anderson v. Nixon*, 444 F.Supp. 1195 (D.D.C. 1978).

18. *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir.), *cert. denied sub nom., Arizona v. McGraw–Hill, Inc.*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982).

19. Pl. Resp., Ex. 5, at 2.

20. *See id.* at 2–3.

### (i) November 7, 2000

The first article complained of is from the November 7, 2000 edition of *InsideInside Radio*, which purports to be an account of why *Inside Radio* prints "such awful things about Clear Channel" and why the attacks had picked up recently.[19]  It reports that Del Colliano wanted to sell *Inside Radio* and had bragged that he would irritate CCC to such an extent that it ultimately would buy him out at his price. It points to circumstances that, it asserts, made Del Colliano desperate, accuses him of printing stories about CCC that were factually incorrect with respect to such matters as its commissions to sales people and the multiple of cash flow that it allegedly paid for some Ohio radio stations, and in many other respects, characterizes those statements as "Jerry's lies," and attributes unflattering motives to him.[20]  The story is alleged to have been defamatory in a number of respects, the critical one for present purposes being that *InsideInside Radio* falsely charged Del Colliano with *intentionally* publishing false and negative stories.[21]

The magistrate judge held that IRI's claims based on this and other similar stories did not waive the confidential source privilege because the gist of the stories complained of was that IRI had published false statements about CCC, and that CCC could prove that the statements about it were false—and therefore that its accusation that IRI published false statements about CCC was true—on the basis of evidence readily available to it and without access to confidential sources. As the magistrate judge said:

> "With respect to the rest of it, which is on pages 2 through 18 of the supplemental

21. *See id.* at 3 ("The foregoing statements ... are false and defamatory ... because they [f]alsely state or imply that plaintiff Del Colliano *intentionally* published and threatened to publish false and negative stories in its *Inside Radio* newsletter ... about Clear Channel as part of an alleged 'extortion' and 'blackmail' scheme to compel Clear Channel to buy Inside Radio at an inflated price ...." (emphasis added)); *id.* at 4 (claiming that quoted statements are defamatory because they "[f]alsely state or imply that plaintiffs *intentionally* target and threaten specific people and companies with false and negative news coverage" (emphasis added)).

interrogatory, each one [*i.e.,* each *InsideInside Radio* story complained of] consists of an allegation that Inside Radio falsely stated some fact and [in] virtually every case[,] as far as I can tell, it is a fact about Clear Channel itself or some entity that they own. The defendants framed the issue in this case, and I'm quoting, may a plaintiff bring suit for defamation based on statements that he makes up stories and lacks credible sources and block discovery as to whether he has such sources. And again looking now through what has changed since they made that statement through the submission of the supplemental response, that's no longer the issue any longer. And as I look through each of these statements, I conclude that while the defendants certainly are entitled to and will be expected to put on a truth defense with respect to the allegation that they falsely stated these statements are false, the question here is whether it is critically relevant for them to know the confidential sources behind those statements. I conclude that it is not.

"In fact, far from being critically relevant, I don't think it's relevant at all, and the reason for this is that Clear Channel ultimately requires witnesses to show the truth of their contention that plaintiff's statement is false. So, for example, Inside Radio says commission rates have been cut at Clear Channel, Clear Channel says this is false, and they also say it was part of some scheme to extort money from Clear Channel and so forth. But Clear Channel obviously has its own methods for proving whether it cut its commission rates and access to witnesses, so we must ask: Do they need the confidential source that told Inside Radio the opposite of this in order to prove its truth? And it just logically makes no sense to me because if that source is saying they have cut their rates, then when it comes time for Clear Channel to prove they didn't cut their rates, they don't need that source; they'll just be able to say it.

"And most importantly, Inside Radio will be unable to rely on that source to counter the truth defense by refusing to identify the source. Obviously they're precluded from using that source at trial. Obviously Del Colliano will not be able to testify to the subject matter of what that source told him because it would be hearsay. So, if the source truly said this, either the source was completely wrong, in which case their testimony could only hurt Clear Channel, it would do them no good to put the individual on the stand to testify against their position and then impeach him, that would be a foolish exercise. So Clear Channel has no need for the source at all. Clear Channel can calls its own witnesses to testify to the fact that it does not cut rates or any other stories. That is what it needs for its truth defense and it has every opportunity to do that in this case.

"And the person who is going to be in a difficult position is Inside Radio who is not going to be able to counter that with that source who was supposedly the basis for the story." [22]

If IRI were complaining that CCC had defamed it merely by saying, in substance, that particular statements in *Inside Radio* were false, this analysis would be entirely right. To take the example used by the magistrate judge, if IRI claimed that it was defamed when CCC said that IRI had stated incorrectly that CCC had cut sales persons' commission rates, IRI would be obliged to prove, as part of its case in chief, that CCC's statement was false [23]—in other words, that

---

22. Pl. Resp., Ex. 2, at 5–7.

23. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776–77, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (burden of proving falsity is on private figure plaintiff when it brings defamation action against media defendant for statements involving matters of public concern); *accord Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 16, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (reaffirming *Hepps* ); *Flamm v. Am. Ass'n of Univ.*

*Women,* 201 F.3d 144, 149 (2d Cir.2000) ("[I]n a suit by a private plaintiff involving a matter of public concern, we hold that allegedly defamatory statements must be provably false, and the plaintiff must bear the burden of proving falsity, at least in cases where the statements were directed towards a public audience with an interest in that concern."). This presupposes that CCC's statements about *Inside Radio* involve matters of public concern. The Court need not decide this

CCC in fact had cut sales commissions. The information concerning whether CCC actually had done so would be available from CCC and others. Further, as the magistrate judge explained, IRI could not rely upon information allegedly provided by a confidential source to prove the truth of its charge that CCC had cut sales commissions because any out of court statement by the source, offered for its truth, would be inadmissible hearsay. In consequence, neither the existence of a confidential source nor the substance of what any such source had told IRI would matter. But the November 7, 2000 article goes well beyond such assertions.

After portraying Del Colliano as desperate to sell *Inside Radio* and attributing to him an intention to get his price by blackmailing CCC, *InsideInside Radio* included the subhead "How Bold Has Jerry Become?". Beneath that subhead, it answers the question by stating "Bold enough to print untrue stories that hurt people in an attempt to annoy Clear Channel." [24] It then charges that two specific *Inside Radio* stories were false in stated respects and characterizes those erroneous statements as "Jerry's lies." [25] Thus, the gist of the *InsideInside Radio* article of November 7, 2000 was not simply that *Inside*

*Radio* had printed factually incorrect statements about CCC. Rather, it was that Del Colliano *deliberately* printed falsehoods about CCC. Hence, in order to prove the falsity of the November 7, 2000 article, IRI will have to prove either that its stories were factually correct or, if not, that Del Colliano did not publish them knowing that they were false. [26]

The parties, as the magistrate judge ruled, can prove whether or not CCC in fact cut commission rates or took other business actions, as reported in *Inside Radio*, without reference to IRI's confidential sources. But IRI's confidential sources, if any, do lie at the core of its contention that CCC libeled it by charging that it *deliberately lied* in its *Inside Radio* articles. That contention puts in issue not merely the accuracy of the factual statements in the *Inside Radio* articles that *InsideInside Radio* claims were false, but IRI's state of mind. [27] And the question whether IRI had any sources for the purportedly factual statements in the *Inside Radio* article and, if so, precisely what they told IRI not only is clearly relevant, but it is pivotal to the claim or defense [28] and unavailable from anyone but IRI.

question at this juncture, however, because the thrust of its analysis would apply equally if the burden were on CCC to prove the truth of its statements.

24. Pl. Resp., Ex. 5, at 3.

25. *Id.*

26. A cautionary note is appropriate concerning the phraseology in the text.

The Court is entirely mindful of the fact that IRI claims that it was defamed not only by the charge that it made up some of the *Inside Radio* stories, or elements thereof, but that its motive for doing so was to extort money from CCC. If it were to prevail entirely here, proof that it was accused falsely of attempting to extort money from CCC might enhance its recovery beyond what it might obtain if it succeeded only on its claim that it was falsely accused of making up phony stories about CCC. Again, however, this nuance does not affect the discovery issue before the Court, which may be decided with reference only to the latter theory.

27. The relevance of IRI's state of mind should be distinguished from that of CCC's state of mind.

The latter goes to the element of fault, which IRI must establish in order to hold CCC liable. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (holding that states may determine for themselves the appropriate standard of liability for a publisher of defamatory falsehoods injurious to a private individual, "so long as they do not impose liability without fault"); *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975) (holding that private figure plaintiffs may recover for statements "arguably within the sphere of legitimate public concern" only when they establish that the media defendant acted in a "grossly irresponsible manner"); *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 655 A.2d 417, 426–428 (1995) (reaffirming that New Jersey law imposes actual malice standard when the subject matter of an article is a matter of public interest, but adopting a restrictive definition of matters within the public interest); *see also Florida Star v. B.J.F.*, 491 U.S. 524, 539, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (noting in *dicta* that the least protected defamatory statements are evaluated under an ordinary negligence standard).

28. Depending upon where the burden of proof lies. *See supra* note 23.

Given the nature of IRI's claim, CCC would not be protected by the hearsay rule. As has been shown, if the only claimed libel were *InsideInside Radio*'s statements that *Inside Radio* had made incorrect factual statements about CCC, IRI could not rely upon information provided by confidential sources to support any contention that its *Inside Radio* articles were accurate. The statements of confidential sources in such circumstances would be offered to prove the truth of the matters asserted and be inadmissible under the hearsay rule. Here, on the other hand, the question is whether IRI *deliberately* printed falsehoods about CCC— whether "Jerry lies," as CCC so pithily put it. What is at issue, in part, is Del Colliano's state of mind. And evidence of whether there were any sources for any false statements and, if so, what they told him would be offered not for the truth of the sources' statements, but for their effect on Del Colliano's state of mind. The hearsay rule would be no obstacle to such proof.[29]

In sum, then, the magistrate judge erred in concluding that IRI had not waived the journalist's privilege with respect to discovery of information concerning the existence and the substance of communications with confidential sources for the *Inside Radio* articles referred to in the November 7, 2000 *InsideInside Radio* article.

### (ii) The Remaining Articles

This analysis has broad implications in light of at least one specific claim made by plaintiffs. It is well to consider that claim before passing on to the other subjects of IRI's complaint.

One of the *InsideInside Radio* articles of which IRI complains is that of February 7, 2001. It begins by reporting that a number of sources are providing information to CCC that will "confirm that Jerry uses his publica-

tion to ... punish people he can't control."[30] It refers to him as a racketeer and as "Jerry Del Corleone," a reference to a fictional Mafia *don*, and accuses him of shaking down advertisers and broadcasters.[31] It then says that "Jerry's false stories are printed to advance his agenda with reckless disregard for the truth."[32]

IRI contends that the story is defamatory because these and other quoted statements "[f]alsely state or imply that plaintiffs intentionally target and threaten specific people and companies with false and negative news coverage." Thus, IRI claims that CCC's broad assertion that IRI intentionally prints false stories to "target and threaten" industry figures is false. But it does not tell us whether it contends that the CCC assertion is false because (a) all of IRI's stories are true, (b) there are some falsehoods, but any inaccuracies are inadvertent rather than deliberate, (c) IRI deliberately or recklessly prints false stories, but its motive in doing so is not to shake down advertisers or broadcasters, or (d) some combination of the foregoing. This claim therefore is enormously broad. On the current state of the pleadings, IRI would be entitled to seek to establish any or all of these positions with respect to virtually every sentence ever written in *Inside Radio*. In any case, it certainly could seek to establish that any inaccuracy in any of its articles was an innocent mistake that occurred as the result of misinformation, or misunderstanding of accurate information, from a confidential source.

To the extent that it is open to IRI to attempt to establish defamation on the theory that any errors were inadvertent, the existence of confidential sources and the substance of their communications with IRI would be vital for precisely the reasons set forth above, a conclusion that necessarily implies that maintenance of this claim would

---

**29.** FED. R. EVID 801(c) (" 'Hearsay' is a statement ... offered in evidence to prove the truth of the matter asserted."); *see Tierney v. Davidson*, 133 F.3d 189, 192 & n. 1 (2d Cir.1998) (statements by anonymous caller and two bystanders were not hearsay when they were offered for their effect on police officer's state of mind); *Kirnon–Emas v. Am. Mgmt. Ass'n*, No. 00 Civ. 3960(JGK), 2002 WL 523368, at *3 n. 1 (S.D.N.Y. Apr.5, 2002); *United States v. Dinero Exp., Inc.*, No. 99 Cr.

75(SWK), 2000 WL 1134484, at *3 (S.D.N.Y. Aug. 9, 2000).

**30.** Pl. Resp., Ex. 5, at 7.

**31.** *Id.*

**32.** *Id.* at 7–8.

result in a wholesale waiver of the privilege as to confidential sources for all articles prior to the February 7, 2001 date of the *InsideInside Radio* article that is at issue. In consequence, IRI has waived the journalist's privilege as to confidential sources for all articles published by it prior to February 7, 2001 unless, on or before July 15, 2002, it serves CCC and files with the Court an affidavit or declaration withdrawing the claim based on statements or implications in the February 7, 2001 article that plaintiffs intentionally target and threaten specific people and companies with false and negative news coverage.

In view of the fact that this discovery dispute already has consumed far too much time and of the likelihood, in view of past actions, that IRI will withdraw this claim, the Court has resolved the remaining disputes in accordance with the principles set forth in this section. The rulings are set forth in the attached schedule.

## III

For the foregoing reasons, the magistrate judge's order of May 16, 2002 is affirmed in part and reversed in part. CCC's motion to compel disclosure of confidential source information is granted to the extent indicated herein.

SO ORDERED.

## ATTACHMENT
### Schedule

| *InsideInside Radio* article | Substance of Alleged Libel | Disposition |
| --- | --- | --- |
| 11/10/00 | Del Colliano is "a malicious terrorist who shows a reckless disregard for the truth." *Inside Radio* falsely stated that CCC was cutting expenses in a N.Y. morning show, eliminating live overnight shifts, and had paid 44 times cash flow for Ohio cluster of stations. Also accuses Del Colliano of lying in saying that CCC made offer for *Inside Radio*. | Privilege waived as to sources, if any, for allegedly false *Inside Radio* statements by assertion of claim that CCC libeled Del Colliano by stating that he "shows a reckless disregard for the truth" in these respects. Not waived as to alleged lie regarding offer, as non-privileged information concerning that question is readily available from principals and other known sources. |
| 11/14/00 | Solicits readers to give CCC "dirt on Del Corleone," that IRI guilty of "dirty tricks and unethical behavior," and offers $100 prizes for information. | Magistrate judge did not abuse discretion in concluding that disclosure of source information was not critical to this claim or the defense thereto. |
| 11/28/00 | Del Colliano prints "bogus," "reckless, untruthful stories." Accuses IRI of falsely reporting on February 15, 2000 that John Fullam of CCC went on a junket to Puerto Rico with Ricky Martin. | Privilege waived as to sources, if any, for allegedly false report regarding Puerto Rico junket. |
| 5/3/01 | "Jerry participating in an Internet smear campaign of Clear Channel" by providing informa- | Privilege waived as to sources, if any, for |

| | | |
|---|---|---|
| | tion regarding AMFM (a CCC affiliate) producers and continued "a pattern or practice of shaking down companies" by extorting money from Westwood One and Cumulus. | statements relating to AMFM producers and articles or threatened articles regarding Westwood One and Cumulus. |
| 5/24/01 | "[T]he first three stories in Inside Radio almost always bash Clear Channel" as part of "pattern and practice" of "using the threat of unfavorable press coverage as a vehicle to pressure radio companies and radio executives to pressure radio companies . . . into doing his bidding." Said to have libeled IRI by "[f]alsely stat[ing] or imply[ing] that plaintiff Del Colliano intentionally published or threatened to publish false and negative stories about Clear Channel." | Privilege waived as to sources, if any, for stories relating to Clear Channel. |
| 1/30/02 | Inside Radio published false stories (a) about CCC actions with respect to Britney Spears air play and concert tour, and (b) characterizing CCC as "warehousing" stations in furtherance of an "agenda" including "punishing those who don't cooperate or who won't send [Del Colliano] money." Said to have libeled IRI by "[f]alsely stat[ing] or imply[ing] that plaintiff Del Colliano intentionally published or threatened to publish false and negative stories about Clear Channel." | Privilege waived as to sources, if any, for stories relating to CCC and Britney Spears and referring to CCC as "warehousing" stations. |